# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

04 JUL 19  PM 4: 47

U.S. DISTRICT COURT
N.D. OF ALABAMA

**TARA M. VICK, et al.,**                  }

    **Plaintiffs,**                  }

                      }

**v.**                  }            **CV-02-P-2986-S**

                     }

**HONDA MANUFACTURING OF**                  }
**ALABAMA and TOM CHICKERELLA,**                  }

    **Defendants.**                  }

**ENTERED**

JUL 1 9 2004

## MEMORANDUM OPINION

The court has before it the November 24, 2003 motion of Defendant Tom Chickerella ("Chickerella") for summary judgment (Doc. #50) and the September 30, 2003 motions of Defendant Honda Manufacturing of Alabama ("Honda") for summary judgment (Docs. #30, 31, 32, 33.)[1] Pursuant to the court's December 29, 2003 order, (Doc. #66), the motions for summary judgment are considered without oral argument.

---

[1] On September 30, 2003, Defendant Chickerella filed separate motions for summary judgment on the following claims: Amy Thornton's invasion of privacy claim; Tara Vick's invasion of privacy claim; Tara Vick's assault and battery claim; and Teresa Springfield's invasion of privacy claim. (Docs. #26, 27, 28, 29.) On October 3, 2003 the case was reassigned to this court. (Doc. #46.) The parties were ordered on November 5, 2003 to resubmit, on or before November 26, 2003, previously filed summary judgment submissions in accordance with court conventions. (Doc. #49.) Thereafter, Chickerella replaced his pending motions of September 30, 2003 by a single motion for summary judgment filed November 24, 2003. (Doc. #50.) The court found Chickerella's September 30, 2003 motions to be moot without prejudice on May 17, 2004. (Docs. #86, 87, 88, 89.) Therefore, the more recent motion for summary judgment (Doc. #50) will be considered herein.

Also on September 30, 2003, Defendant Honda Manufacturing of Alabama filed separate motions for summary judgment on all claims alleged by Amy Thornton, Tara Vick, Teresa Springfield, and Kim Tiedemann. (Docs. #30, 31, 32, 33.) Those motions, not having been resubmitted to this court, will be considered herein.



Having considered the briefs and evidentiary submissions, the court finds that Defendants'

Motions for Summary Judgment are due to be granted in part and denied in part for the reasons

outlined below. Defendants' Motions to Strike Plaintiffs' Affidavits or Portions Thereof (Docs. #70,

71, 79) and Motion to Deem Admitted Certain Facts (Doc. #80) are also due to be granted in part

and denied in part for the reasons outlined below.

## I.    Procedural History

Plaintiff Tara Vick commenced this action on October 25, 2002 by filing a complaint in the

Circuit Court of Jefferson County Alabama alleging that her supervisor, Chickerella, and her

employer, Honda, are liable for subjecting her to various uninvited and unwelcome acts of

harassment and touchings, which invaded on her physical solitude or seclusion. (Compl. attachment

to Doc. #1.) Plaintiff Vick contends that Defendants' alleged conduct constitutes assault and battery

and invasion of privacy under Alabama state law.  (*Id.*)

On December 6, 2002, the case was removed to federal court on diversity jurisdiction.[2]

(Doc. #1.) On February 24, 2003 Magistrate Judge Ott granted the February 18, 2003 motion to add

Teresa Springfield, Amy Thornton, and Kim Tiedemann as party plaintiffs pursuant to Federal Rule

of Civil Procedure 20.  (Docs. #11, 12.)  An amended complaint was thereafter filed on February

24, 2003 alleging that Defendants' conduct constitutes: (1) assault and battery against Tara Vick;

(2) invasion of privacy against Tara Vick; (3) hostile environment/sex and gender harassment and

retaliation against Teresa Springfield; (4) invasion of privacy against Teresa Springfield; (5) hostile

---

[2] The Notice of Removal filed on December 6, 2002 failed to properly allege diversity
jurisdiction. (Doc. #1.) While the amount in controversy was properly alleged, Defendant Honda
failed to state the principal place of business of its sole member.  There being no evidence in the
record that the principal place of business is Alabama, this court nevertheless concludes that it has
jurisdiction over this case.

work environment/sex and gender harassment and retaliation against Kim Tiedemann; (6) hostile

work environment/sex and gender harassment and retaliation against Amy Thornton; and (7)

invasion of privacy against Amy Thornton. (Doc. #13.)

Defendant Chickerella's November 24, 2003 Motion for Summary Judgment or in the

Alternative for Partial Summary Judgment asserts that no genuine issue of material fact exists and

that Chickerella is entitled to judgment as a matter of law as to all claims asserted against him.

(Doc. #50.) Defendant Honda's September 30, 2003 Motions for Summary Judgment assert that no

genuine issue of material fact exists and that Honda is entitled to judgment as a matter of law as to

all claims asserted against Honda. (Doc. #30, 31, 32, 33.)

The parties have each filed briefs and submitted evidence in support of their respective

positions concerning the pending motions for summary judgment.   On November 24, 2003,

Defendant Chickerella submitted evidence[3] in support of the motion, (Doc. #51), and also filed a

supporting memorandum of law (Doc. #51.) On November 26, 2003, Defendant Honda submitted

evidence[4] in support of the motions submitted on September 30, 2003, (Docs. #58, 59, 60, 61), and

---

[3] Defendant Chickerella submitted his November 21, 2003 deposition and adopted all of the
evidentiary material submitted by Honda.

[4] On December 2, 2003, Defendant Honda submitted, in support of its motion as to claims
alleged by Tara Vick: (1) the May 23, 2003 deposition of Tara Vick with exhibits; (2) the June 13,
2003 deposition of Tara Vick with exhibits; (3) the September 26, 2003 affidavit of Linda Bailey
with exhibits; (4) the September 26, 2003 affidavit of Rick Mayo with exhibits; (5) the September
25, 2003 affidavit of Vickie Vaughan with exhibits; (6) the May 28, 2002 statement of Tom
Chickerella; (7) the September 29, 2003 affidavit of Andrew H. Ritter; (8) the September 26, 2003
affidavit of Henry A. Turner, Jr., with exhibits; (9) the September 29, 2003 affidavit of April
Reddick; and (10) the September 26, 2003 affidavit of Dawn Watkins.
As to claims alleged by Teresa Springfield, Defendant Honda submitted on December 2,
2003: (1) the May 22, 2003 deposition of Teresa Springfield; (2) September 26, 2003 affidavit of
Linda Bailey with exhibits; (3) the September 26, 2003 affidavit of Rick Mayo with exhibits; (4) the
September 25, 2003 affidavit of Vickie Vaughan with exhibits; (5) the May 28, 2002 statement of

filed supporting memoranda of law (Docs. #53, 54, 55, 56.) Plaintiffs submitted evidence[5] in

opposition to the motions on January 9, 2004, (Doc. #68), and on the same date filed an opposing

brief (Doc. #67.) On January 27, 2004 Defendant Honda filed reply briefs in further support of its

Motions for Summary Judgment as to all claims asserted against Honda. (Docs. #73, 74, 75, 76.)

On the same date, Defendant Chickerella filed a reply brief in further support of his motion for

---

Tom Chickerella; (6) the September 29, 2003 affidavit of Andrew H. Ritter; (7) the September 26, 2003 affidavit of Henry A. Turner, Jr., with exhibits; (8) the September 26, 2003 affidavit of Kevin Kinsey with exhibits; (9) the September 26, 2003 affidavit of Dawn Watkins; (10) the September 29, 2003 affidavit of April Reddick; and (11) the September 25, 2003 affidavit of Mary Nicholls with exhibits.

On December 2, 2003, Defendant Honda submitted, in support of its motion as to claims alleged by Kim Tiedemann,: (1) the July 11, 2003 deposition of Kim Tiedemann with exhibits; (2) portions of the June 12-13, 2003 deposition of Amy Thornton; (3) the September 26, 2003 affidavit of Linda Bailey with exhibits; (4) the September 26, 2003 affidavit of Rick Mayo with exhibits; (5) the September 25, 2003 affidavit of Vickie Vaughan with exhibits; (6) the May 28, 2002 statement of Tom Chickerella; (7) the September 29, 2003 affidavit of Andrew H. Ritter; (8) the September 26, 2003 affidavit of Henry A. Turner, Jr., with exhibits; (9) the September 26, 2003 affidavit of Kevin Kinsey with exhibits; and (10) Plaintiff Kim Tiedemann's certified copy of US Bankruptcy court records.

Also on December 2, 2003 Defendant Honda submitted in support of its motion as to claims alleged by Amy Thornton: (1) the June 12-13, 2003 deposition of Amy Thornton with exhibits; (2) portions of the May 22, 2003 deposition of Teresa Springfield; (3) portions of the July 11, 2003 deposition of Kim Tiedemann; (4) the September 26, 2003 affidavit of Linda Bailey with exhibits; (5) the September 26, 2003 affidavit of Rick Mayo with exhibits; (6) the September 25, 2003 affidavit of Vickie Vaughan with exhibits; (7) the May 28, 2002 statement of Tom Chickerella; (8) the September 29, 2003 affidavit of Andre H. Ritter with exhibits; (9) the September 26, 2003 affidavit of Henry A. Turner, Jr., with exhibits; (10) the September 26, 2003 affidavit of Dawn Watkins; and (11) the September 29, 2003 affidavit of April Reddick.

[5] Plaintiffs submitted in support of the opposition to summary judgment: (1) the signed affidavit of Kim Tiedemann in substitution for the unsigned affidavit pursuant to this court's May 2004 order; (2) the unsigned affidavit of Tara Vick; (3) the unsigned affidavit of Teresa Springfield; (4) Plaintiff's Response to Defendants' Statement of Facts (Tara Vick); (5) Plaintiff's Response to Defendants' Statement of Facts (Tiedemann); (6) Plaintiff's Response to Defendants' Statement of Facts (Amy Thornton); (7) the unsigned affidavit of Tara Vick; (8) the August 15, 2003 deposition of Linda Bailey; (9) doctors' notes indicating the medical history of Teresa Springfield; (10) Tom Chickerella's personnel file; (11) the September 5, 2001 letter of disciplinary action regarding Tom Chickerella; and (12) the description of the job from which Amy Thornton was denied.

4

summary judgment. (Doc. #72.)

Defendant Honda filed a Motion to Strike Plaintiffs' Affidavits on January 27, 2004. (Doc. #79.)   On the same date, Honda filed a Motion to Deem Admitted Certain Facts.   (Doc. #80.) Defendant Chickerella filed a Motion to Strike Portions of Affidavit of Teresa Springfield on January 27, 2004. (Doc. #70.)   On the same date, Defendant Chickerella filed a Motion to Strike Portions of Affidavit of Tara Vick.   (Doc. #71.)   Additionally, the court granted Plaintiff Tiedemann's Motion to Substitute Unsigned Affidavits for Signed Affidavits, (Doc. #84), as well as Tiedemann's Motion to Substitute Unsigned Affidavit with Executed Copy (Doc. #85.)

## II.   <u>Legal Standards for Evaluating a Summary Judgment Motion</u>

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986.) The party asking for summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings which it believes demonstrate the absence of a genuine issue of material fact. *See id.* at 323.   Once the moving party has met her burden, Rule 56(e) requires the non-moving party to go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial. *See id.* at 324.

The substantive law will identify which facts are material and which are irrelevant. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986.) All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant. *See Fitzpatrick v. City of*

*Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993.)  A dispute is genuine "if the evidence is such that a

reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.  If the

evidence is merely colorable, or is not significantly probative, summary judgment may be granted.

*See id.* at 249.

The method used by the party moving for summary judgment to discharge her initial burden

depends on whether that party bears the burden of proof on the issue at trial. *See Fitzpatrick*, 2 F.3d

at 1115-17 (citing *United States v. Four Parcels of Real Property*, 941 F.2d 1428 (11th Cir.

1991)(en banc).)  If the moving party bears the burden of proof at trial, then it can only meet its

initial burden on summary judgment by coming forward with positive evidence demonstrating the

absence of a genuine issue of material fact; i.e. facts that would entitle it to a directed verdict if not

controverted at trial. *See Fitzpatrick*, 2 F.3d at 1115.  Once the moving party makes such a showing,

the burden shifts to the non-moving party to produce significant, probative evidence demonstrating

a genuine issue for trial.

If the moving party does not bear the burden of proof at trial, she can satisfy her initial

burden on summary judgment in either of two ways.  First, the moving party may produce

affirmative evidence negating a material fact, thus demonstrating that the non-moving party will be

unable to prove its case at trial.  Once the moving party satisfies its burden using this method, the

non-moving party must respond with positive evidence sufficient to resist a motion for directed

verdict at trial.  The second method by which the moving party who does not bear the burden of

proof at trial can satisfy its initial burden on summary judgment is to *affirmatively* show the absence

of evidence in the record to support a judgment for the non-moving party on the issue in question.

This method requires more than a simple statement that the non-moving party cannot meet its burden

6

at trial but does not require evidence negating the non-movant's claim; it simply requires that the movant point out to the district court that there is an absence of evidence to support the non-moving party's case. *See Fitzpatrick*, 2 F.3d at 1115-16. If the movant meets her initial burden by using this second method, the non-moving party may either point out to the court record evidence, overlooked or ignored by the movant, sufficient to withstand a directed verdict, or the non-moving party may come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency. However, when responding, the non-movant can no longer rest on mere allegations, but must set forth evidence of specific facts. *See Lewis v. Casey*, 518 U.S. 343, 358 (1996) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992).) The court is aware that the summary judgment rule applies in job discrimination cases just as in other cases. *Chapman v. AI Transport*, 229 F.3d 1012, 1025 (11th Cir. 2000) (rejecting an earlier, contrary general rule and emphasizing that no thumb is to be placed on either side of the scale.)

## III.   Relevant Undisputed Facts[6]

### A.   General Facts Applicable to All Plaintiffs

Honda began operating in Alabama in 2000 in a temporary location in Pell City; during July and August of 2001, Honda relocated to a manufacturing plant in Lincoln. (Bailey Aff. ¶ 8.) All employees of Honda in Alabama are referred to as associates in accordance with a philosophy of "Respect for the Individual." (*Id.* at ¶ 2.)[7]

---

[6] If the facts are in dispute, they are stated in the manner most favorable to the Plaintiffs. *Fitzpatrick*, 2 F.3d at 1115.

[7] While Plaintiffs Thornton and Tiedemann have not admitted this fact, the evidence in the record supplied by Defendants for summary judgment purposes demonstrates its veracity, and Plaintiffs Thornton and Tiedemann have presented no contrary evidence. Therefore, the court finds this fact to be admitted for summary judgment purposes. (*See* Doc. #80 at 8, 20.)

Associates are grouped into several departments, one of those departments being the Planning, Ordering, Receiving and Delivery Division ("PORD".) (Mayo Aff. ¶¶ 2, 5.) At all relevant times, Rick Mayo, Division Manager, was responsible for all operations in the PORD. (*Id.* at ¶ 2; Bailey Aff. ¶ 11.) Until May 2002, Tom Chickerella was the Department Manager of Purchasing at Honda and reported directly to Mayo. (Bailey Aff. ¶ 11; Mayo Aff. ¶ 4.)[8]

While operating out of the Pell City office, all associates in the Purchasing Department worked in an open office environment with no walls or dividers between the desks; in Lincoln, associates in all departments work in a large open area with no walls or dividers. (Bailey Aff. ¶ 13.)[9] That is, associates in the Purchasing Department at the Lincoln facility work in the same open room as associates in the Human Resources Department. (*Id.*)[10] In Pell City, approximately 40 associates

---

[8] While Plaintiff Tiedemann has not admitted this fact, the evidence in the record supplied by Defendants for summary judgment purposes demonstrates its veracity and Plaintiff Tiedemann has presented no contrary evidence. Therefore, the court finds this fact to be admitted for summary judgment purposes. (*See* Doc. #80 at 20.)

[9] While Plaintiff Thornton summarily states that she disputes this fact, she cites no evidence supporting the dispute. The only evidence the court is aware of supports the contention. Therefore, the court finds this fact to be undisputed for summary judgment purposes. (*See* Doc. #80 at 4.)

[10] Plaintiff Vick indicates her dispute as to this fact, and offers the affidavits of Vick, Springfield, Tiedemann, and the deposition testimony of Bailey to support this dispute. However, the court sees no statement in any of the Plaintiffs' affidavits contradicting this fact. Similarly, and without the aid from Vick of a specific citation to the deposition of Bailey, the court finds no statement in Bailey's deposition contradicting this fact and instead finds various statements in Bailey's deposition which support it. (*See, e.g.,* Dep. of Bailey 38-40, 132-34, 138.) Therefore, the court finds this fact to be undisputed for summary judgment purposes. (*See* Doc. #80 at 12.) However, the court does not consider Vick's statement that Bailey could not see everything from her workstation to be contrary to the assertion that all employees worked in an open space. (Vick 5 page Aff. ¶ 11 [Vick submitted two affidavits; the 4 page affidavit will be cited unless otherwise indicated]) Additionally, contrary to Defendant's assertion that Vick's statement is based on mere conjecture, the court finds that Vick may, from personal experience, be aware of what Bailey can and cannot see from her desk. (*See* Doc. #79 at 9.) Therefore this separate statement will be considered for summary judgment purposes.

8

worked in the open room at long tables with computers at each associate's work area; in Lincoln, approximately 100 associates work in the open room at desks abutting each other in groups of ten. (Bailey Aff. ¶ 14.)[11]  However, within the open area at the Lincoln plant, there are some areas where not all associates could be seen by other associates.[12]  (Vick Aff. ¶ 2; Springfield Aff. ¶ 5.)  There was not always a time when each associate had someone else sitting across, next to, or behind her.[13]  (Vick Aff. ¶ 2; Springfield Aff. ¶ 5.)  In addition, at both the Pell City and Lincoln plants there were conference rooms where associates could meet privately. (Bailey Aff. ¶ 15.)

Honda utilizes the services of temporary associates who are employed by third parties, but are assigned to work at Honda pursuant to an agreement with the third party employers. (Bailey Aff. ¶ 9.)  More specifically, Honda has obtained temporary associates from the Darrell Walker temporary agency and TRI Staffing. (*Id.*)  Temporary associates of Honda remain employees of and receive paychecks from the relevant temporary agency. (*Id.* at ¶ 10.)[14]  However, even the

---

[11] While Tiedemann has not admitted this fact, the evidence in the record supplied by Defendants for summary judgment purposes shows this statement to be factually correct. Therefore, the court finds this fact to be undisputed for summary judgment purposes. (*See* Doc. #80 at 20.)

[12] Plaintiffs Vick and Springfield dispute Defendants' assertion that all employees could visually observe each other. Therefore, in stating the disputed facts in the light most favorable to the non-movants for summary judgment purposes, the court determines that while employees worked in a large open room, not all associates were able to observe all other associates at all times.

[13] Because this fact is in dispute, it is stated in the manner most favorable to the Plaintiffs.

[14] While Vick and Thornton have not admitted this fact, the evidence in the record supplied by Defendants for summary judgment purposes shows that in fact all Plaintiffs to this action remained employees of Darrell Walker and/or TRI and received their paychecks from the relevant temporary agency and Vick and Thornton have presented no contrary evidence. While Vick asserts that her deposition disputes this fact, her deposition does no such thing. Further, Vick's affidavit states: "Although I was placed at Honda through Darrell Walker Workforce Systems, I received all my workplace assignments and responsibilities solely through Honda associates. The only contact I had with Darrell Walker was to pick up my paycheck. Honda kept records of my attendance and tardiness." (Vick Aff. ¶ 1.)  This does not dispute the fact that all of Honda's temporary employees

temporary associates are required to wear Honda's standard white uniform, consisting of thick cotton white pants and thin cotton jacket with the word "HONDA" and the associate's name on the jacket. (*Id.* at ¶ 7.)[15] The jacket is often worn by the associates over a regular shirt. (*Id.*) The uniforms are supplied by an outside vendor, and all associates are individually sized to ensure a proper fit. (*Id.*) At all relevant times, Honda has maintained a Mutual Respect Policy, which prohibits any type of harassment. (*Id.* at ¶ 5; *see also* Bailey Aff. Ex. 1.)[16] The policy sets out specific examples of inappropriate behavior, a procedure by which associates are to report harassment, and an assurance that all allegations of harassment will be investigated and corrected if necessary. (Bailey Aff. Ex. 1.)[17] The Associates Relations ("AR") area within Honda's

_____

remained employees of the temporary agency. Therefore, the court finds this fact to be undisputed for summary judgment purposes. (*See* Doc. #80 at 3-4, 12.)

[15] Plaintiff Vick disputes this fact and cites her deposition in support of the dispute. However, her deposition does not dispute the fact that all employees were required to wear the uniform; it merely notes that there was a time early during her employment that she had not yet been issued a uniform. (Vick Aff. ¶ 6.) Therefore, the court finds this fact to be undisputed for summary judgment purposes. (*See* Doc. #80 at 13.)

[16] All Plaintiffs dispute this fact, and point to the affidavits of Vick and Springfield in support of the dispute. However, neither the affidavit of Vick nor the affidavit of Springfield specifically address this point. Rather, both of the affidavits state that the affiants were unaware of Honda's Mutual Respect Policy. The only evidence the court is aware of supports the existence of the policy. Therefore, this fact is undisputed for summary judgment purposes. (*See* Doc.#80 at 4, 9, 13, 19.)

[17] Plaintiffs Thornton, Vick, and Springfield deny these facts and cite the depositions of Vick and Springfield in support of the dispute. However, neither the affidavit of Vick nor the affidavit of Springfield specifically address these points. Rather, both of the affidavits state that the affiants were unaware of Honda's Mutual Respect Policy. The only evidence the court is aware of supports the existence of the policy and the contents of the policy. Therefore, these facts will be considered admitted for summary judgment purposes. (*See* Doc. #80 at 4, 9, 13.)

*However, while Defendants assert that the harassment policy was posted on bulletin boards that all associates passed when entering and exiting the Lincoln facility, this fact is in dispute.* (Springfield Aff. ¶ 3; Vick Aff. ¶ 3; Tiedemann Aff. ¶ 3.) And while Defendants argue that Vick's affidavit contradicts her prior deposition testimony on this point, (Doc. #79 at 4), the court finds no

Department of Human Resources, and specifically Linda Bailey, Team Manager of AR, was

responsible for coordinating all AR activities for the time period of March 19, 2001 until June 2002.

(Bailey Aff. ¶¶ 2, 3; Vaughan Aff. ¶ 2.)[18] Bailey was responsible for addressing associate concerns

regarding pay, benefits, and other policy-related questions.  (Bailey Aff. ¶ 3.)[19]

Tom Chickerella was trained on Honda's Mutual Respect Policy, and was aware that under

that policy, any harassing behavior would be reported to higher management or investigated by AR,

and that discipline, including termination, would be issued to any employee found to have violated

the policy. (Chickerella Aff. ¶ 8.)[20]  He was also aware that engaging in unwelcome physical or

---

such contradiction. A mere absence of a statement in a deposition is not contrary to an affirmative statement in an affidavit. Therefore, the court will proceed under the assumption that the harassment policy was not posted at all times relevant to this lawsuit.

[18] While Tiedemann has not admitted that Linda Bailey was Team Manager for the relevant time period, the evidence in the record supplied by Defendants for summary judgment purposes verifies this fact and Tiedemann has presented no contrary evidence. Similarly, while Plaintiffs Vick, Tiedemann, and Springfield have not admitted that Bailey was responsible for coordinating activity for Honda's associates, they cite in support of the dispute Bailey's affidavit, without citing to a specific page number. Upon review of the deposition, the court is unaware of any evidence supporting the contention that Bailey was not in fact responsible for coordination. Therefore, the court finds this fact to be admitted for summary judgment purposes. (*See* Doc. #80 at 11, 18, 20.)

*However, while Defendants assert that the AR associates provide training for Honda associates and address associate concerns in all areas of Human Resources, this fact is in dispute, and so will not be considered in deciding the motions before the court.*

[19] While Vick, Springfield, and Tiedemann have not admitted this fact, the evidence in the record supplied by Defendants for summary judgment purposes shows that these were Bailey's responsibilities, and Vick, Springfield, and Tiedemann have presented no contrary evidence. Therefore, the court will consider this fact undisputed for summary judgment purposes. (*See* Doc. #80 at 11, 18, 20.)

[20] While Springfield denies that Chickerella was trained on the Mutual Respect Policy, she comes forward with no evidence supporting this dispute. Further, while Tiedemann has not admitted these facts, the evidence in the record supplied by Defendants for summary judgment purposes shows that in fact Chickerella was trained on the policy and knew of the consequences of not following the policy and Tiedemann has not presented any contrary evidence. Therefore, the court finds these facts to be undisputed for summary judgment purposes. (*See* Doc. #80 at 9, 21.)

verbal behavior of a sexual nature was prohibited by the company and could lead to discipline or even discharge. (*Id.*)[21] Rick Mayo, who had worked with Chickerella at Honda in Ohio,[22] never had any problems with Chickerella and was not aware of Chickerella harassing anyone in Ohio. (Mayo Aff. ¶ 4.)[23] Henry Turner also worked with Chickerella at Honda in Ohio for approximately five years, and during that time never saw or heard Chickerella harass any female associate, or act inappropriately around any female associate. (Turner Aff. ¶ 5.)[24]

### B.    Facts Applicable to Claims Asserted by Tara Vick

Plaintiff Vick applied for employment with the Darrell Walker temporary agency on June 11, 2001, and knew at that time that she would be an employee of Darrell Walker assigned to work for customers of Darrell Walker, such as Honda. (Dep. of Vick 114-15.)[25]  On June 25, 2001,

---

[21] While Tiedemann has not admitted this fact, the evidence in the record supplied by Defendants for summary judgment purposes verifies this fact, and Tiedemann has presented no contrary evidence. Therefore, this fact is undisputed for summary judgment purposes. (*See* Doc. #80 at 21.)

[22] In Ohio, Mayo received extensive training on a wide range of topics, including sexual harassment. (Mayo Aff. ¶ 3.) This training included instruction on what constitutes sexual harassment, how to prevent sexual harassment, how to recognize sexually harassing behavior, and how to report sexual harassment. (*Id.*) While Tiedemann has not admitted these facts, the evidence in the record supports their veracity and Tiedemann has presented no contrary evidence. Therefore, these facts are undisputed for summary judgment purposes. (*See* Doc. #80 at 21.)

[23] While Tiedemann and Springfield have not admitted this fact, the evidence in the record supplied by Defendants for summary judgment verifies this fact, and Plaintiffs Tiedemann and Springfield have presented no contrary evidence. Therefore, this fact is undisputed for summary judgment purposes. (*See* Doc. #80 at 11, 21.)

[24] While Tiedemann, Springfield, and Vick have not admitted this fact, the evidence in the record supplied by Defendants for summary judgment verifies this fact, and Plaintiffs Tiedemann, Springfield, and Vick have presented no contrary evidence. Therefore, this fact is undisputed for summary judgment purposes. (*See* Doc. #80 at 11, 18, 21.)

[25] Defendants argue that Vick's affidavit contradicts her prior deposition testimony as to whether she believed herself to be a Darrell Walker or Honda employee. (*See* Doc. #79 at 3.) The

12

Darrell Walker temporarily assigned Vick to Honda's Pell City location as an Office Support Assistant ("OSA") in the Purchasing Department.[26]  (Second Dep. of Vick 48; Bailey Aff. ¶ 16.) Thereafter, Vick provided her time sheets to Darrell Walker and received her paycheck from Darrell Walker.  (*Id.* at 19, 23.)  Both Honda and Darrell Walker kept track of her attendance and tardiness. (*Id.* at 115-19; *see also* Dep. of Vick at ¶ 1.)[27]  However, Vick never worked at Honda as a full time associate; she only worked at Honda when assigned there by Darrell Walker.  (Dep. of Vick 76; 79-80.)[28]

---

court finds no such contradiction, as Plaintiff could rightfully have considered herself to be an employee of both Darrell Walker and Honda.  Therefore, the court refuses to strike this portion of Vick's affidavit.  Additionally, while Vick voices her disagreement in her Response to Defendants' Statement of Facts that she knew she would be a Darrell Walker employee assigned to Honda, she cites no evidence supporting her contention.  Therefore, the court finds this fact undisputed for summary judgment purposes.  (*See* Doc. #80 at 12.)

[26] During the course of her interview with Darrell Walker, Vick alleges that Christa Griffith asked her if she got offended easily because Chickerella liked to joke around a lot.  (Vick Aff. ¶ 1.) Contrary to Defendant's assertion, this statement is not due to be stricken on grounds that it contains impermissible hearsay.  (*See* Doc. #79 at 7.)  While it is an out of court statement, it is not necessarily being used to prove the truth of the matter asserted.  Similarly, the statement is not irrelevant and immaterial, and will be used herein for summary judgment purposes in stating the facts in the light most favorable to Vick.

[27] Vick states that she disputes the fact that Darrell Walker kept track of her attendance and tardiness at Honda, based on the fact that her deposition states that Honda kept track of her attendance and tardiness.  Contrary to Defendant's assertion, the court does not view these statements to create a dispute, as both Darrell Walker and Honda could well have (and in fact should have) kept up with Vick's attendance and tardiness.  (*See* Doc. #80 at 13-14.)

[28] While Vick voices her disagreement with this fact in her Response to Defendants' Statement of Facts and points to her deposition to support this dispute, the deposition states only that Vick was placed at Honda through Darrell Walker and that Vick in fact worked at Honda.  The court does not view these statements to create a dispute.  Therefore, the court considers that Vick worked at Honda but only when assigned there through Darrell Walker.  (*See* Doc. #80 at 13-14.)

### 1. Facts Applicable to Vick's Assault and Battery Claim

Plaintiff's claim of assault and battery is based on separate, frequent allegations of incidents of physical contact by Chickerella:

Vick alleges that **one time** in June 2001, while she was walking down the hallway with another temporary employee, Chickerella approached her from the opposite direction and brushed his chest against her breasts.[29]  (*Id.* at 122, 127, 135-36.)  At the time of the contact Chickerella allegedly apologized and Plaintiff did not respond.  (*Id.* at 128.)  Vick testified that she believed Chickerella intentionally brushed against her breasts in the hallway.  (*Id.* at 129-30.)  Chickerella denies that this incident ever took place and states that even if the contact did occur, it was accidental, inadvertent, and completely unintentional.  (Doc. #51 at 3-4; Chickerella Aff. line 67.)

Plaintiff Vick also alleges that during the time period of **approximately once a week** from June 25, 2001 through August 22, 2001,[30] Chickerella would find a reason[31] to stand directly behind

---

[29] There is a dispute in the record as to whether or not the hallway at which this contact occurred was so narrow that both Plaintiff and Chickerella had to turn sideways in order to pass each other.  While Defendants cite Vick's deposition to support this assertion, Vick's deposition in fact states only that the hallway was narrow enough that *she* had to turn sideways.  There is no support in her deposition for the contention that Chickerella also had to turn sideways due to the narrow nature of the hallway.  (Dep. of Vick 127-28.)  Therefore, for summary judgment purposes the court states this fact in the manner most favorable to the Plaintiff.

[30] Defendants assert that Vick is inconsistent in her deposition and affidavit concerning the frequency of breast brushing incidents.  (*See* Doc. #79 at 4.)  The court sees no such inconsistency.  Vick's affidavit states only that she was "subjected to daily sexual harassment from Chickerella."  (Vick Aff. ¶ 4.)  It does not specifically state that Chickerella brushed against her breasts every day.  On the other hand, Vick's deposition clearly states that the breast brushing incidents occurred "at least once a week."  (Dep. of Vick 138.)  This is consistent with her testimony that Chickerella's hand came in contact with her breasts "four times."  (*Id.* at 299-300.)  Therefore, the court considers both the affidavit and the deposition testimony on this point.  (*See* Doc. #79 at 4.)

[31] The court finds that this portion of Vick's affidavit should not be stricken since Vick could rationally believe, based on the frequency of the conduct, that Chickerella would find a reason to stand by Plaintiff's desk.  (*See* Doc. #71 at 1-2.)

her chair at her workstation on the long table in the open room, lean over, put his hands on the table on each side of her, look over her shoulder at a document on the table or at her computer screen,[32] and, as he was removing his arms, would intentionally[33] rub her arm or brush[34] the side of her breast with one hand. (Dep. of Vick 123, 138-39, 141-45, 154, 292-93.)  Vick also alleges that if their hands were close, Chickerella would sometimes touch Plaintiff's hand with his finger. (*Id.* at 145.) In addition, on **one occasion** in July 2001, Vick alleges that while she was sitting at her workstation and Chickerella was looking at her computer screen, Chickerella cupped the side of Vick's breast as he withdrew his hand. (*Id.* at 154-55, 157-58.)  Vick did not tell anyone that Chickerella cupped her breast. (*Id.* at 165.)  She testified, however, that she believed at the time that Chickerella was intentionally touching her, even though he never said anything to her that indicated he was intentionally engaging in the conduct, because "he could have sat beside me and looked at the documents . . . he was invasive.  He invaded my personal space."[35] (*Id.* at 145.)  Chickerella denies that these incidents ever took place and states that even if they did occur, they were accidental,

---

[32] While Vick summarily states that she disputes the fact that Chickerella would lean over her to look at documents in her Response to Defendants' Statement of Facts, the court finds no evidence in the record contrary to this statement, and therefore is undisputed for summary judgment purposes. (*See* Doc. #80 at 14.)

[33] The court finds that this portion of Vick's affidavit should not be stricken since Vick could rationally believe, based on the alleged frequency of the conduct, that Chickerella purposefully came into contact with her chest. (*See* Doc. #71 at 1-2.)

[34] Specifically, Vick testifies: "I would lean forward.  When he would come up from leaning over me, he would brush my arm, and it's not like a brush.  It's kind of – not a grip but - kind of a grip.  He would mold my arm like this and come up." (Dep. of Vick 142.)

[35] Defendants argue that Vick's affidavit contradicts her prior deposition testimony on this point. (Doc. #79 at 4.)  The court finds no such contradiction.  Defendants also argue that Vick's affidavit on this point should be stricken because it is contrary to Federal Rule of Evidence 701. (Doc. #71 at 2.)  However, this statement is based on Vick's perception, and will therefore be considered.

inadvertent and completely unintentional. (Doc. #51 at 4-5; Chickerella Aff. line 84.)

Plaintiff Vick also alleges that **approximately once a week** between the time period of June 25, 2001 and August 22, 2001 Chickerella massaged her shoulder with his hand. (Dep. of Vick 165-66, 307.)  Vick would sometimes pull away when Chickerella engaged in this contact but did not say anything directly to Chickerella regarding his behavior.  (*Id.* at 308-09.)  In addition, Vick alleges that on **two or three occasions** between June 25, 2001 and August 22, 2001 Chickerella handed Plaintiff a document to copy while she was at the copy machine and pinched her side between her ribs and her hip with his thumb and forefinger. (*Id.* at 124-25, 171, 309.)  Finally, in support of her assault and battery claim, Vick alleges that **on one occasion for approximately ten seconds**, Chickerella rubbed her leg with his leg. (*Id.* at 313-14.)[36]  This alleged conduct occurred when Chickerella's feet were on the floor, and he was shaking his legs. (*Id.* at 317.)  However, with regard to this last allegation, Chickerella denies that this incident ever took place, and states that even if the incident did occur, it was accidental, inadvertent, and completely unintentional. (Doc. #51 at 5-6; Chickerella Aff. line 100-01.)

Finally, Plaintiff Vick alleges that Chickerella "tugged on my pony tail every chance he got." (Vick Aff. ¶ 13.)  While she made no mention of these incidents in her deposition, the court will

---

[36] Because Plaintiff's deposition testimony contradicts her subsequently filed affidavit on this point, and Plaintiff has not presented a sufficient explanation for the differences, only the deposition testimony will be considered for purposes of summary judgment. (*See* Doc. #79 at 6.) *See also Van T. Junkins and Associates, Inc. v. U.S. Industries, Inc*, 736 F.2d 656, 657 (11th Cir. 1984)("When a party has given clear answers to unambiguous questions which negate the existence of any genuine issue of material fact, that party cannot thereafter create such an issue with an affidavit that merely contradicts, without explanation, previously given clear testimony.").

consider this allegation as part of Plaintiff's assault and battery claim.[37]

In sum, Plaintiff Vick alleges approximately 15 incidents of touching that she asserts amount to assault and battery. She alleges that because of Chickerella's tendency to touch her, she was afraid of contact every time he approached her. (Dep. of Vick 175; Vick Aff. ¶ 4.)

## 2.   Facts Applicable to Vick's Invasion of Privacy Claim[38]

In support of her invasion of privacy claim, Vick alleges that Chickerella had a habit of putting his hands behind his head, leaning back on his chair, and sitting with his legs apart in a manner that drew attention to his groin area. (Dep. of Vick 140, 318-19.) Vick alleges that these incidents occurred **approximately 120 times**, and that Chickerella seated himself in this fashion to purposely call attention to his genital area. (Springfield Aff. ¶ 8; Dep. of Vick 328.) **Three of the times** that Chickerella was seated in this fashion, Vick alleges that it appeared that Chickerella had an erect penis. (*Id.* at 324.) While maintaining this alleged erection, Vick contends that Chickerella was talking about business topics, such as purchasing orders, parts, new models, numerical equations and supplier issues, and not about sex or the Plaintiff. (*Id.* at 370-71.) Chickerella denies that these incidents ever took place and states that even if they did occur, they were not done with any knowledge or intent that one could make an outline of his penis, or with the intention of intruding upon the solitude, seclusion, private affairs or concerns of Plaintiff Vick. (Doc. #51 at 6-7; Chickerella Aff. lines 112-19.)

---

[37] Defendants argue that Vick's affidavit contradicts her prior deposition testimony on this point. (Doc. #79 at 5.) Once again, the court finds no such contradiction, and will consider this fact for purposes of summary judgment.

[38] Some facts stated as applicable to Vick's assault and battery claim are also applicable to her invasion of privacy claim. Therefore, the facts should not be read as exclusively applying to assault and battery or invasion of privacy.

Plaintiff alleges that **on August 8, 2001**, Chickerella called Vick on the phone and asked her to send out an email to PORD personnel reminding them about procedures for the move from Pell City to the Lincoln facility. (Dep. of Vick 232, 436.) Chickerella relayed to Vick what information he wanted included in the email, including an instruction to wear full uniforms to the facility. (*Id.* at 232-33.) Within the course of the conversation, Vick asked Chickerella what employees should do if they did not have full uniforms yet, as she herself did not yet have a full uniform. (*Id.* at 233-34.) Plaintiff claims that Chickerella responded, "Well, Tara, I wouldn't mind if you didn't come to work with your shirt on." (*Id.* at 234.) When Vick responded that she seriously needed to know what those individuals who did not have a full uniform should do, Chickerella responded, "I am serious. I wouldn't mind if you came to work without a shirt on. I don't think anyone else would mind."[39] (*Id.*) The next day, Vick claims that Chickerella asked her if she had thought about his suggestion not to wear a shirt to work. (*Id.* at 237.) After Plaintiff responded, "No, not really. Have you?" Chickerella responded, "Actually, yes I have."[40] (*Id.*) Plaintiff then allegedly turned away from Chickerella and resumed her work. (*Id.*) Around the same time period, Plaintiff claims that **one time** Chickerella walked by her as she was standing with a group of females and said, "hey girls your uniforms are not tight enough. They're a little too loose." (*Id.* at 349-50.) Chickerella denies that these incidents ever took place and states that even if they did occur, they were not made intentionally to intrude, physically or otherwise, upon Plaintiff Vick's solitude, seclusion, private affairs, or concerns. (Doc. #51 at 8-10; Chickerella Aff. lines 157-161; 184-85.)

---

[39] Defendants argue that Vick's affidavit contradicts her prior deposition testimony on this point. (Doc. #79 at 4-5.) The court finds no such contradiction and therefore this statement will be considered for summary judgment purposes.

[40] *See id.*

18

Plaintiff also complains that Chickerella invaded her privacy by using the word "goddamn" approximately **ten times** and on **one occasion** using the words "bitch" and "motherfucker." (Dep. of Vick 340-43.)  However, Plaintiff never asked Chickerella to stop using profanities, though she did generally complain about being harassed by Chickerella. (*Id.* at 342-43; Vick Aff. ¶ 9.) Indeed, Chickerella admits that he may have used the word "bitch" in conversation, but that he never used any of the other words complained of by Vick. (Chickerella Aff. lines 124-130.) In denying the use of these profanities, Chickerella comments that if he did use those words, he did not do so to intrude upon Vick's solitude, seclusion, private affairs or concerns. (*See* Chickerella's Submission in Response to Exhibit "A" of the court's Order at 7.)

Plaintiff's next claim is that an invasion of her privacy occurred when Chickerella invited her and her co-workers, Amy Thornton and April Reddick, to go to the Cropwell Pub & Grill after work **on August 9, 2001**, to have drinks and celebrate the move from Pell City to Lincoln. (Dep. of Vick 189-90, 436.)  Plaintiff alleges that she was reluctant to go, but Chickerella coaxed her into going by saying, "I see how you're going to be.  I offered to take you out for drinks, and you're going to turn me down."[41] (*Id.* at 198.) Once at the bar, Plaintiff drank alcoholic drinks because she thought it would be rude to order anything else. (*Id.* at 206-07.)  While the conversation during this group outing was centered primarily on the move from Pell City, (*id.* at 208-09), Plaintiff alleges that when she was alone with Chickerella, he asked her if the shirt comment had offended her (*id.* at 211), and she responded that it had offended her (*id.* at 212.)  Chickerella then allegedly responded that some people like to joke around, while others are more sensitive. (*Id.* at 212.)

---

[41] Defendants argue that Vick's affidavit contradicts her prior deposition testimony on this point. (Doc. #79 at 5; *see also* Doc. #80 at 15.) The court finds no such contradiction, and therefore this statement will be considered for summary judgment purposes.

Chickerella also allegedly "began pressuring [Vick] to go out with him" when she was alone with him.[42]  (Vick Aff. ¶ 12.)  Also during the course of conversation at the pub, Vick claims that Chickerella said, "Honda is so big, we can't be touched.  Nobody could sue us and get away – get it." (*Id.* at 356-57.)  Chickerella denies that he paid for the drinks ordered by Vick, and states that he did not intentionally intrude, physically or otherwise, on her solitude, seclusion, or private affairs by asking her to join him at the pub.  (Chickerella Aff. lines 178-81; Chickerella's Submission in Response to Exhibit "A" of the court's Order at 9-10.)  In addition, Chickerella denies that he made the statement that Honda was so big, nobody could touch them, and states that in the event he did make the statement, it was not made in a context to intentionally intrude on Vick's solitude, seclusion, and private affairs.  (Chickerella Aff. lines 171-74; Chickerella's Submission in Response to Exhibit "A" of the court's Order at 9.)

Finally, Vick alleges that Chickerella invaded her privacy by stating, "Tara, don't forget you are just a temp to me," reminding her that if he did not want her at Honda, she would not be working there,[43] by assigning her to work stations close to the managers, and by treating her

---

[42] Defendants argue that Vick's affidavit contradicts her prior deposition testimony on this point. (Doc. #79 at 6.)  The court finds no such contradiction, and therefore this statement will be considered for summary judgment purposes.

[43] Plaintiff states in her affidavit that this statement was clearly heard on a tape recording she gave Honda's attorneys. (Vick Aff. ¶ 9.)  The statement is not impermissible hearsay under the Federal Rules of Evidence because it is offered for it's effect on the listener. Therefore, Defendant's motion to strike this statement is due to be denied. (*See* Doc. #79 at 7.)  However, because the recording is not part of the summary judgment record before the court, the court will not consider the recording's existence as part of the summary judgment analysis. Further, Defendants argue that Vick's statement that Chickerella had input into whether or not Honda offered her a permanent position should be stricken because it is based on speculation and conjecture, without any facts to support it. (*See* Doc. #79 at 8.)  However, because Chickerella told Vick that she he could affect her employment and this statement affected Vick, Vick's statement was not mere conjecture.

differently than he treated male associates.  (Chickerella Aff. lines 136-37, 142-44, 151-52.)

Chickerella denies making the statement and assigning and treating Vick unfavorably, and states that

in the event he did those things, they were not done to intrude on Vick's solitude, seclusion, private

affairs, or concerns.  (Chickerella Aff. lines 137-40, 144-47, 152-53, 178-81; Chickerella's

Submission in Response to Exhibit "A" of the court's Order at 7-8.)

### 3.    Vick's Report of Alleged Conduct and Honda's Response

Since at least 1999 or 2000 Vick has known what sexual harassment is and how to report it.

(*Id.* at 90, 92-93.)  She knew during her employment with Honda that Honda prohibited sexual

harassment.[44]   (*Id.* at 354-55.)   While there is evidence that Vick did not know if reporting

harassment would lead to an investigation, (Vick Aff. ¶ 3), she did know that there would be at least

some repercussions from reporting harassment (Dep. of Vick 355.)  Plaintiff claims that she never

asked Chickerella to stop the alleged conduct because she was embarrassed, she thought it would

go away, and she did not know how to tell him to stop.[45]  (*Id.* at 147-48, 167, 172.)

Vick met with Henry Turner, who reported to Chickerella, and expressed **some of her**

**concerns** about Chickerella's conduct.  (Turner Aff. ¶ 7.)  In turn, Turner reported the alleged

conduct to Linda Bailey of AR.  (*Id.* at ¶ 8.)  Bailey then met with Vick privately and asked her

---

[44] Defendants argue that Vick's affidavit contradicts her prior deposition testimony on this point. (Doc. #79 at 4.)  The court finds no such contradiction, and therefore this statement will be considered for summary judgment purposes.

[45] While Vick states that she disputes that she never asked Chickerella to stop his conduct, she cites no evidence disputing this fact and the court is unaware of any evidence disputing this fact. Therefore, this fact will be considered undisputed for summary judgment purposes. (*See* Doc. #80 at 14.)

about the concerns she had shared with Turner.[46] (Dep. of Vick 254.) During the course of the conversation, Vick claims that she asked Bailey several times what sexual harassment was and if she had been sexually harassed, and received no clear response. (Vick Aff. ¶ 9.) Plaintiff told Bailey that she did not want the issue to be "a huge thing,"[47] (Dep. of Vick 260), because she was afraid she would lose her job based on comments made by Chickerella that if he did not want her as his employee, she would not be working at Honda (Vick Aff. ¶ 9.)

Bailey ultimately concluded that Vick had not been sexually harassed. (Bailey Aff. ¶ 26.) However, Bailey did conclude that Chickerella's remarks to Plaintiff were inappropriate and demonstrated poor judgment and decided to write Chickerella a formal letter of reprimand, which was placed in his personnel file. (*Id.*) After taking this action, Bailey informed Vick that her harassment concerns had been "addressed," but did not tell Vick that she had concluded that Vick had not been sexually harassed. (Vick Aff. ¶ 10.) Although Vick's deposition testimony is not

---

[46] Plaintiff Vick asserts several times in her deposition that she did not report any of the alleged conduct, other than the shirt comment and the bar outing, to anyone, including Honda and Darrell Walker. For example, Plaintiff states that she did not report the hallway incident to anyone. (Dep. of Vick 132, 134-35, 137-38.) She also states that she did not report the continuous brushes against her chest to Bailey or anyone else in AR. (*Id.* at 140-41.) She states that no one at Honda knew of the pinching incidents at the copy machine. (*Id.* at 170-72.) While Plaintiff attempts to dispute this by citing to her initial affidavit, her later-filed affidavit makes no mention of her reporting incidents of touching to Honda. Because no explanation has been offered for this contradictory testimony, the court will advance on the premise that Vick made no formal complaint of harassment prior to the time she complained of the shirt comment and the bar outing. *See Van T. Junkins and Associates, Inc. v. U.S. Industries, Inc,* 736 F.2d 656, 657 (11th Cir. 1984.)

[47] Defendants argue that Vick's affidavit contradicts her prior deposition testimony when recounting her conversation with Linda Bailey. (Doc. #79 at 5.) In her deposition, Vick states that she was not accusing Chickerella of harassment because she wasn't sure that it was sexual harassment, but rather knew his behavior was inappropriate. (Dep. of Vick 259-61, 265-66.) In her affidavit, Vick states that "it took a lot of courage on my part to even report this harassment to anyone at Honda." (Vick 5 page Aff. ¶ 9.) The court does not view these statements as inconsistent, and therefore they will both be considered for summary judgment purposes.

about the concerns she had shared with Turner.[46]   (Dep. of Vick 254.)  During the course of the

conversation, Vick claims that she asked Bailey several times what sexual harassment was and if

she had been sexually harassed, and received no clear response.  (Vick Aff. ¶ 9.)  Plaintiff told

Bailey that she did not want the issue to be "a huge thing,"[47] (Dep. of Vick 260), because she was

afraid she would lose her job based on comments made by Chickerella that if he did not want her

as his employee, she would not be working at Honda (Vick Aff. ¶ 9.)

Bailey ultimately concluded that Vick had not been sexually harassed.  (Bailey Aff. ¶ 26.)

However, Bailey did conclude that Chickerella's remarks to Plaintiff were inappropriate and

demonstrated poor judgment and decided to write Chickerella a formal letter of reprimand, which

was placed in his personnel file.  (*Id.*)  After taking this action, Bailey informed Vick that her

harassment concerns had been "addressed," but did not tell Vick that she had concluded that Vick

had not been sexually harassed.  (Vick Aff. ¶ 10.)  Although Vick's deposition testimony is not

---

[46] Plaintiff Vick asserts several times in her deposition that she did not report any of the
alleged conduct, other than the shirt comment and the bar outing, to anyone, including Honda and
Darrell Walker.  For example, Plaintiff states that she did not report the hallway incident to anyone.
(Dep. of Vick 132, 134-35, 137-38.)  She also states that she did not report the continuous brushes
against her chest to Bailey or anyone else in AR.  (*Id.* at 140-41.)  She states that no one at Honda
knew of the pinching incidents at the copy machine.  (*Id.* at 170-72.)  While Plaintiff attempts to
dispute this by citing to her initial affidavit, her later-filed affidavit makes no mention of her
reporting incidents of touching to Honda.  Because no explanation has been offered for this
contradictory testimony, the court will advance on the premise that Vick made no formal complaint
of harassment prior to the time she complained of the shirt comment and the bar outing.  *See Van
T. Junkins and Associates, Inc. v. U.S. Industries, Inc*, 736 F.2d 656, 657 (11th Cir. 1984).

[47] Defendants argue that Vick's affidavit contradicts her prior deposition testimony when
recounting her conversation with Linda Bailey.  (Doc. #79 at 5.)  In her deposition, Vick states that
she was not accusing Chickerella of harassment because she wasn't sure that it was sexual
harassment, but rather knew his behavior was inappropriate.  (Dep. of Vick 259-61, 265-66.)  In her
affidavit, Vick states that "it took a lot of courage on my part to even report this harassment to
anyone at Honda."  (Vick 5 page Aff. ¶ 9.)  The court does not view these statements as inconsistent,
and therefore they will both be considered for summary judgment purposes.

altogether clear, the facts as viewed most favorably to her indicate that Chickerella's conduct did not cease after Bailey's investigation. (Dep. of Vick 139-41.) Vick does admit in her deposition, however, that she had no reason to believe that Honda would have condoned Chickerella's actions. (*Id.* at 176-77.) However, Vick has stated in her affidavit and deposition that she was unable to obtain Honda's policy on sexual harassment[48] and that she received an unsatisfactory answer from Bailey as to what types of acts constituted sexual harassment. A reasonable inference can and should be drawn in Vick's favor that an alleged refusal to hand out a policy on harassment may ratify or condone harassment.

Plaintiff Vick reported the same conduct to Valerie Campbell at Darrell Walker on August 22, 2001. (Dep. of Vick 22-3.) Plaintiff understood that she could have complained of the conduct to Darrell Walker sooner than she did. (*Id.* at 386.) She resigned on the same day, telling Bailey that she believed she was capable of doing more than she was doing, wanted to do more, and thought it would be best for her to move on. (*Id.* at 412-13.) She asserts in her affidavit that in fact the reason for her leaving was that she could no longer bear the constant touching.[49] (Vick Aff. ¶ 10.)

### C.    Facts Applicable to Claims Asserted by Teresa Springfield

Plaintiff Springfield applied for employment at the Darrell Walker temporary agency in April 2001. (Dep. of Springfield 63, 70, 75, 82.) In June 2001, Darrell Walker assigned Springfield to

---

[48] Defendants argue that Vick's affidavit contradicts her prior deposition testimony on this point. (Doc. #79 at 4.) The court finds no such contradiction. Plaintiff alleges that she requested that Linda Bailey provide her a copy of Honda's policy on harassment and Bailey refused to give it to her. (Vick Aff. ¶ 3.) Prior deposition testimony merely fails to mention Bailey's refusal to provide the policy. (Dep. of Vick 132, 172, 330, 352-55.)

[49] Defendants argue that Vick's affidavit contradicts her prior deposition testimony on this point. (Doc. #79 at 6; *see also* Doc. #80 at 18.) The court finds no such contradiction, and therefore this statement will be considered for summary judgment purposes.

23

work at Honda and explained to her that her position at Honda was a temporary one, but that Honda could decide to hire her as a regular full time employee of Honda. (*Id.* at 76.)[50]   At Honda, Springfield worked as an Office Support Assistant ("OSA") in the Parts Maturation Area, which is a division of Honda's PORD division, and reported to Kevin Kinsey,[51] Team Manager Purchasing/Parts Maturation. (*Id.* at 91, 94, 105, 137.)   Kinsey reported directly to Tom Chickerella.[52] (Kinsey Aff. ¶ 4.)   According to Springfield's affidavit, Kinsey never met with her individually to go over her job responsibilities or discuss Honda policies and procedures, including procedures for reporting problems.[53] (Springfield Aff. ¶ 5.)   Nevertheless, according to Kinsey, Springfield did a good job performing her clerical duties for him at Honda. (Kinsey Aff. ¶ 8.)

---

[50] Springfield understood that she worked at Honda on temporary assignment.  Though she disputes this fact in her Response to Defendants' Statement of Facts, she cites no contrary evidence, other than her affidavit, which states only that: "My only contact with Darrell Walker after my placement with Honda was to be given my paycheck each week." (Springfield Aff. ¶ 2.) Therefore, the court proceeds on the basis that Springfield knew that she worked for Honda on a temporary basis. (*See* Doc. #79 at 10.)

[51] Although Springfield has not admitted that Kinsey underwent supervisory training covering a wide variety of topics, including sexual harassment in the workplace, the evidence presented by Defendants for summary judgment purposes supports that Kinsey was in fact trained, and Springfield has come forward with no evidence disputing this fact.  Therefore, the court will proceed on the basis that Kinsey had been trained on the issue of sexual harassment in the workplace. (*See* Doc. #80 at 11.)

[52] Although Springfield did not work directly with Chickerella or report to him, she controlled and reconciled his purchasing card credit ("P card") and ordered his supplies. (Dep. of Springfield 105, 136-37.)  Around the third month of her employment at Honda, Springfield was assigned to do more work for Chickerella. (Springfield Aff. ¶ 7.)

[53] While it may have been Kinsey's practice to meet with all regular and temporary employees to discuss policies and procedures, it is disputed as to whether Kinsey met with Springfield to discuss these matters with her.  Therefore, this fact is stated in the manner most favorable to the Plaintiff.

While working at the Pell City location, Springfield sat in the same spot every day; there was an empty spot across from her and Kinsey sat diagonally to her right, but he was not always there. (Dep. of Springfield 103, 104; Springfield Aff. ¶ 5.)  Similarly, someone did not sit next to Springfield every day. (Springfield Aff. ¶ 5.) Tom Chickerella sat across from her at the Pell City location, and she looked at his back when he was sitting at his desk.[54]  (*Id.* at ¶ 6.)  After Honda moved to the Lincoln facility, Plaintiff again had a regular workstation, and to her left was an empty workstation. (Dep. of Springfield 131, 134.) Kinsey sat across from Springfield, and associates sat to the right of Kinsey. (*Id.* at 134-35.)  Chickerella sat diagonally and to the right of Plaintiff two rows away from her.  (*Id.* at 135-36; 390-97.)

### 1.    Facts Applicable to Springfield's Hostile Work Environment and Invasion of Privacy Claims

When working on Chickerella's P card, Springfield alleges that **one time** at the Pell City location Chickerella was standing by her workstation, reached down for a piece of paper, and lightly touched her breast. (Dep. of Springfield 111, 113.)  While Springfield did not see Chickerella's hand make contact, she did feel it against her chest.  (*Id.* at 116.)

After the move to the Lincoln plant, Springfield alleges that the harassing conduct of Chickerella continued.  (*Id.* at 142, 144-45.)  Specifically, she claims that **between August and November 2001**, Chickerella: (1) brushed up against her breasts **four to five times**; (2) used profanity; and (3) put his erect penis in her face. (*Id.* at 142, 144-45.) Allegedly, Chickerella would

---

[54] Although Springfield states that she disputes this fact in her Response to Defendants' Statement of Facts and cites her affidavit in support of her dispute, her affidavit clearly states that at the Pell City location she sat diagonally from Chickerella and that she faced his back. (Springfield Aff. ¶ 6.) Therefore, this fact is undisputed for summary judgment purposes. (*See* Doc. #80 at 8.)

go to Springfield's workstation and deliberately[55] brush against her breasts in the course of pointing something out on her computer. (*Id.* at 145-46, 149, 151, 348.) These incidents reportedly shocked the Plaintiff, and as a result she began to move her chair away from Chickerella when she saw him approaching her workstation. (Springfield Aff. ¶ 7.) She also would stand up and let him sit at her chair at the computer to prevent the breast touching incidents from occurring. (Dep. of Springfield 355.) Springfield has testified that these defensive measures worked to prevent Chickerella from touching her breasts. (*Id.* at 353-56.) Chickerella denies that these breast-brushing incidents ever occurred and states that even if they did take place, they were not done with the intention to intrude, physically or otherwise, upon Springfield's solitude, seclusion, private affairs or concerns. (Doc. #51 at 1-2.)

Springfield also alleges that she heard Chickerella use profanities in the workplace **approximately fifteen times**. (Dep. of Springfield 153-54, 160.) Plaintiff claims that Chickerella and Mayo were constantly cussing at each other. (*Id.* at 156.) **One time** Chickerella came out of a meeting and allegedly told Springfield to "move the hell out of the way bitch." (*Id.* at 154, 159.) This is the only time, however, that Chickerella directly referred to Springfield using that term. (*Id.* at 160-61.) Nevertheless, Springfield took offense of the use of profanity in the workplace, as Chickerella was not discreet in his use of questionable vocabulary.[56] (Springfield Aff. ¶ 9.)

---

[55] While Defendants argue that the court should not consider Springfield's statement that Chickerella brushed against her breasts deliberately, (*see* Doc. #70 at 1-2), the court finds that the statement does not violate Federal Rule of Evidence 701 because the frequency of the brushing could rationally lead Springfield to believe that the breast brushing incidents were deliberate.

[56] Springfield states in her deposition that her sensitivity to profanity has become more acute as she became more religious. (Dep. of Springfield 162-63.) In contrast, her later filed affidavit states that she is not overly sensitive. (Springfield Aff. ¶ 9.) Since these two statements are not in direct conflict and the facts must be stated in a manner most favorable to the Plaintiff, the court finds

Chickerella denies that he used profanity in the workplace other than the term "son of a bitch" one time, and states that even if he did use additional profanity, it was not done with the intention to intrude, physically or otherwise, upon Springfield's solitude, seclusion, private affairs or concerns. (Doc. #51 at 2.)

In further support of her sexual harassment charge, Plaintiff claims that Chickerella "placed an erect penis in her face" by engaging in two types of conduct: (1) sitting in a chair close to her, putting one leg in front of her chair and the other leg behind her chair, and in that manner reviewing work with her; and (2) sitting in his own chair at his workstation with his chair tilted back, his hands behind his head, his legs spread, his feet flat on the floor, and his groin uplifted.  (Dep. of Springfield 164-65, 169, 179-80, 367-70, 388.)  Springfield claims that **four or five times** she looked down towards Chickerella's lap and saw what she thought was the outline of an erect penis. (*Id.* at 179, 369.)  However, Chickerella never indicated that he was erect or took any action to direct Plaintiff's attention to his groin area.  (*Id.* at 181-82, 380.)  Nevertheless, Springfield contends that she was offended by Chickerella sitting in this fashion, and that she would be offended by any male sitting in a manner which drew attention to his groin area.[57]  (*Id.* at 180-81.)  Chickerella denies that these incidents ever occurred and states that even if they did take place, they were not done with the intention to intrude, physically or otherwise, upon Springfield's solitude, seclusion, private affairs or concerns.  (Doc. #51 at 2-3.)

---

that Springfield's religious beliefs make her sensitive to profanity, but not overly sensitive.

[57] When Springfield was asked during the course of her deposition if she was offended by this conduct as a born-again Christian, she indicated her agreement with this statement.  However, this does not support Defendants' contention that Springfield was offended only because of her religious beliefs.

### 2.   Springfield's Reports of the Alleged Conduct

Before she was employed at Honda, Springfield knew that it was wrong for an employee to make a co-employee feel uncomfortable by making sexual remarks or engaging in other sexual conduct, and she knew she should report such behavior to management immediately. (Dep. of Springfield 31, 33, 37, 39-40, 52-4.) In fact, Springfield put this knowledge into practice in 1989 or 1990 when she reported to a former employer that her manager was sexually harassing her. (*Id.* at 42, 311-12.) While Plaintiff was aware that Honda had an anti-harassment policy during the period of her assignment there, she was never given a Honda employee handbook, nor did she see the "Mutual Respect Policy" posted anywhere during the tenure of her employment at Honda. (Springfield Aff. ¶ 3.)

Nevertheless, Springfield did not say anything to Chickerella about the breast brushing incidents because she did not want to "make waves" and she desired regular employment at Honda. (Dep. of Springfield 116, 118-19, 146-47, 151-52.) Springfield did not tell Chickerella that she was offended by his manner of sitting for the same reason and because she did not know how to bring up the subject in conversation. (*Id.* at 189, 403, 430.) However, Springfield did ask Chickerella not to use vainly the Lord's name in front of her, and she believes that he made a good faith effort to comply with this request. (*Id.* at 163-64, 359-61.)

Plaintiff planned to report Chickerella's alleged conduct after she was made a regular associate at Honda.[58] (*Id.* at 191.) However, in October 2001, Kinsey saw Springfield sitting at her

---

[58] Springfield reported Chickerella's sexually harassing conduct to Christa Griffith at Darrell Walker. (Springfield Aff. ¶ 5.) She testifies that Christa Griffith told her that Chickerella had "hit on her" also, and asked her what applicants looked like before he interviewed them. (*Id.*) Defendants assert that these two latter statements constitute impermissible hearsay, (*see* Doc. #70 at 1; *see also* Doc. #79 at 11), and this court agrees. For summary judgment purposes, the latter two

desk shaking her head, and at that time Springfield told Kinsey that Chickerella made her feel

uncomfortable. (*Id.* at 192-94.) Plaintiff claims that Kinsey asked her if she felt that Chickerella

was sexually harassing her, to which she responded that he had touched her in ways that made her

feel uncomfortable and used language that made her uncomfortable. (*Id.* at 194.)

In response, Kinsey told Springfield that he would talk to Chickerella and that once she

became a regular associate of Honda, she would no longer work for Chickerella. (*Id.* at 195.)

Springfield testified that at the time of this conversation, she believed that Kinsey "knew that I told

him Chickerella touched me inappropriately, sat in his chair in a lewd manner, and that his language

was foul."[59] (Springfield Aff. ¶ 11.) Further, Plaintiff notes that Kinsey was not always at his desk

to observe Chickerella's interaction with her, and Chickerella would only sexually harass her when

no one else was around. (*Id.*)

Springfield admits that after this conversation with Kinsey, she experienced no more

incidents of sexual harassment, though no formal complaint was ever made to AR and Springfield

has no knowledge of Chickerella ever being informed that Springfield had concerns with his

_____

statements will not be considered because they are out of court statements offered to prove the truth
of the fact that Chickerella tended to hit on women and was concerned about the appearance of
women.

[59] Kinsey's affidavit disputes this point, but for summary judgment purposes, the fact is
stated in the manner most favorable to Springfield. Kinsey does assert, however, that he was not
concerned about Springfield's allegations of Chickerella standing close to her, because he had
observed that Chickerella did tend to stand close to men and women alike when he was talking with
them, and he thought there to be nothing sexual or inappropriate about the behavior he saw. (Kinsey
Aff. ¶ 12.)
   And while Defendants assert that Plaintiff's statement should be stricken because of its
conclusory nature, (*see* Doc. #79 at 12), the court declines to strike the statement. The fact that
Springfield reported to Kinsey that Chickerella made her feel uncomfortable and that Kinsey had
seen Chickerella standing close to other associates could lead Springfield to believe that Kinsey
knew she was complaining of sexually harassing behavior.

behavior.[60] (Dep. of Springfield 197-98, 202-03.) According to Plaintiff, Kinsey never told her that she needed to make a formal complaint of the sexual harassment.[61] (Springfield Aff. ¶ 11.) However, Kinsey did tell Plaintiff not to work late for Chickerella.[62] (*Id.*)

### 3.    Facts Applicable to Springfield's Retaliation Claim

When Springfield expressed to Kinsey that she wanted to obtain a position as a full time associate at Honda, Kinsey supported Springfield's endeavor and recommended to Tom Chickerella and Rick Mayo that Springfield be hired by Honda as a full time associate in OSA. (Kinsey Aff. ¶ 9.) Thereafter, Springfield filled out a Honda application and interviewed with Kinsey, Chickerella, and Jessie Bell. (Dep. of Springfield 78-9, 203.) In early November 2001, Honda extended Springfield a full time offer of employment, conditioned upon the successful completion of a medical examination performed by Concentra, a third party medical provider with a facility located at Honda's Lincoln plant. (*Id.* at 79, 204-06, 208-10.) During the examination on November 1, 2001, the nurse asked Springfield questions and circled Springfield's answers; Springfield did not read which answers the nurse circled.[63] (Springfield Aff. ¶ 12.) At the end of the session, the nurse

---

[60] While Springfield does not admit these facts, she offers no contrary evidence, and therefore they will be considered for summary judgment purposes. (*See* Doc. #80 at 11.)

[61] According to Kinsey, he told Springfield to let him know immediately if Chickerella's conduct was sexually inappropriate, and he would in turn pass the complaint along to AR. (Kinsey Aff. ¶ 12.) However, as this fact is in dispute, it will not be considered for summary judgment purposes.

[62] Although Defendants argue that this statement contradicts Springfield's prior deposition testimony, (*see* Doc. #79 at 10), the court finds no contradiction. While it is true that Springfield did not mention this comment in her deposition, (dep. of Springfield 301), she said nothing in her deposition that would dispute this fact. Therefore, this fact will be considered for summary judgment purposes.

[63] Although Defendants assert that this statement contradicts Springfield's prior sworn deposition, (*see* Doc. #79 at 10), the court finds no contradiction. Springfield's deposition states

asked Springfield to sign her name to the bottom of the sheet, indicating that Springfield knew it was important to give truthful answers to the questions, and Plaintiff complied with this request. (*Id.*)

In the course of going through the questionnaire, the nurse asked Springfield if she had ever been told that she had fainting spells, to which Springfield answered negatively. (Dep. of Springfield 219, 246-47.) The nurse also asked Plaintiff if she ever had or been told that she had seizures or sleep disorders, to which Springfield also answered negatively. (*Id.* at 258.) After the examination with the nurse, Honda obtained doctor's notes from Springfield's physicians, Dr. Wilhelm and Dr. Kemph.[64] (Springfield Aff. ¶ 13.) Dr. Wilhelm's notes reflected that Springfield was experiencing blackout spells; Plaintiff reported to the doctor that her husband told her she was having episodes during which she was unresponsive. (Dep. of Springfield 231-33.) Plaintiff herself did not consider these spells to be "blackouts," because her husband reported that she was blinking and looking at him, but she was unable to speak. (*Id.* at 234.) Dr. Kemph's notes also reflected that Springfield was being evaluated for "abnormal spells she has had for several years, blackout spells." (Dep. of Springfield at 240-41.) However, Plaintiff states that she never went to Dr. Kemph or any other doctor reporting blackouts; she reports that she only went to doctors reporting unresponsive episodes. (*Id.* at 241, 243.) In fact, Plaintiff testifies that she experienced these episodes due to changes in medications. (*Id.* at 245.)

---

only that she watched the nurse making circles recording the answers, (dep. of Springfield at 217-18), and makes no mention as to whether or not Springfield had time (or took time) to review which answers had been circled by the nurse.

[64] Defendants assert that Concentra asked Plaintiff to contact her treating physician and have faxed to Concentra information pertaining to any restrictions, limitations on duty, or decreased ability to perform repetitive motion jobs. (Nicholls Aff. ¶ 5.) However, because this fact is in dispute, it will not be considered for purposes of summary judgment.

Upon review of these doctors' notes, the Concentra nurse concluded that, contrary to Springfield's answer, Springfield did indeed have a history of fainting spells. (Nicholls Aff. ¶ 6.) Thereafter, Honda decided to rescind Springfield's conditional offer of employment, allegedly on the premise that Springfield had falsified information on her medical questionnaire. (Springfield Aff. ¶ 14.) On November 20, 2001, James Freer of Honda's Staffing/Human Resources department wrote Springfield a letter indicating that she would not be hired as a full time associate at Honda because of inaccurate and incomplete information submitted concerning her medical history. (Mayo Aff. ¶ 25.) It was Honda's policy to terminate the employment of associates where Honda learned associates had provided incomplete or inaccurate information during the hiring process. (Bailey Aff. ¶ 41.)[65]

On November 19, 2001, Springfield telephoned Linda Bailey and told her that she did not understand the conflict between her responses to the nurse's questions and her doctors' notes. (Bailey Aff. Ex. 13.) Springfield requested a copy of Bailey's records, which were sent to her the next day. (Dep. of Springfield 239, 266-67.) On December 30, 2001, Dr. Kemph wrote a letter to Linda Bailey indicating that Springfield's medical problems were, in fact, not blackouts nor fainting spells, and as a result Springfield had answered the questionnaire truthfully. (Kemph letter December 30, 2001.) No one at Honda ever responded to the correspondence indicating that Springfield's answers were not inconsistent. (Springfield Aff. ¶ 14.)

---

[65] Although Springfield has not admitted this fact, Defendants have submitted evidence for summary judgment purposes supporting this fact, and Springfield has come forward with no contrary evidence. Therefore, this fact is undisputed for summary judgment purposes. (*See* Doc. #80 at 11.)

Plaintiff believes that she was actually denied full time employment at Honda because she reported Chickerella's conduct to Kinsey *two weeks before* the conditional full time offer was made to her. (Dep. of Springfield 278.) The basis for Springfield's belief is an alleged comment by Chickerella prior to this time that he made the decisions on who gets hired and who does not. (*Id.* at 278.)

On May 10, 2002, Springfield filed an EEOC charge which did not specifically mention that Chickerella had drawn attention to his groin area, brushed against Springfield's breasts, or used profanity in her presence. (*Id.* at 166-68; Dep. of Springfield Ex. 2.)[66]

### D.   Facts Applicable to Claims Asserted by Kim Tiedemann

Tiedemann was a temporary employee of Darrell Walker who was assigned to work at Honda on July 26, 2001 after an interview for temporary assignment with Chickerella and Kinsey. (Dep. of Tiedemann 27, 86-7, 89, 115-16, 151, 158.) Chickerella, with Rick Mayo's approval, selected Tiedemann to work a temporary assignment in the Purchasing Department. (*Id.* at 151-52.) The Plaintiff believes that Chickerella chose her because of her job skills. (*Id.* at 153-55.)

At the time of hire, Tiedemann understood that in order to obtain regular employment at Honda, she would have to work a certain number of hours, do a good job, and maintain regular attendance; to this end, Tiedemann understood that Honda would evaluate her job performance and attendance in deciding whether or not the company would extend her an offer of permanent employment at Honda. (*Id.* at 148, 180.) Plaintiff also understood at the time she was hired that sex

---

[66]   While the first of these matters is alleged in the Amended Complaint, neither the breast-brushing incidents nor the use of profanity are specifically mentioned in the Amended Complaint, although the Amended Complaint does state that Chickerella "would come over to [Springfield's] desk and make her feel very uncomfortable." (Doc. #13.)

discrimination and sexual harassment were against the law, and that if she was discriminated against or harassed, she must report that conduct to management.[67] (*Id.* at 74-76, 79-80, 82, 94-95, 97.) Indeed, Plaintiff understood that she was to report any sex harassment or sexual discrimination to both Darrell Walker and the company to which she was assigned to work by Darrell Walker. (*Id.* at 96-97.)

For her first two weeks on temporary assignment at Honda, Tiedemann worked with Chickerella as an OSA in the PORD department. (*Id.* at 149, 158-59.) After those two weeks, Rick Mayo requested that Tiedemann work primarily for him as an OSA, and Plaintiff therefore moved to a workstation closer to Mayo. (*Id.* at 149, 159-60, 319; Mayo Aff. ¶ 8.) At the time Mayo requested that Tiedemann work for him, he was aware that she weighed approximately 250 pounds and had dark hair. (Mayo Aff. ¶ 8.)[68]

### 1.    Tiedemann's Employment Record at Honda

When Tiedemann began her employment at Honda, Darrell Walker warned her to be at work as scheduled, because Honda had a very strict attendance policy. (Dep. of Tiedemann 118.) Tiedemann admits that despite her knowledge of the strict attendance policy, she had poor

---

[67] In fact, at every job Tiedemann had worked after July of 1999, she had received training and information on what constitutes sexual harassment and how to report it. (Dep. of Tiedemann 95-6.) In addition, when Tiedemann began her employment with Darrell Walker, the temporary agency gave her information about sexual harassment and how to report it. (*Id.*)

[68] Although Tiedemann has not admitted this fact, the evidence presented by Defendants for summary judgment purposes shows that Mayo was aware of Tiedemann's physical characteristics at the time he requested she work for him, and Tiedemann has submitted no contrary evidence. The court agrees with Defendants that this fact is undisputed for summary judgment purposes. (*See* Doc. #80 at 21.) For that matter, Mayo did not make employment decisions based on physical attributes, and therefore Tiedemann's weight and hair color made no difference to him. (Mayo Aff. ¶ 8.) And again, while Plaintiff has not admitted this fact, she has offered no contrary evidence. Therefore, this fact is undisputed for summary judgment purposes. (*See* Doc. #80 at 20.)

attendance at Honda and that her poor attendance was adversely affecting Honda's perception of her. (*Id.* at 98-100, 118, 251, 278-80; Mayo Aff. ¶ 14, Ex. 1.) More specifically, Tiedemann was absent: September 4, 6, and 13 of 2001; almost the entire week ending October 21, 2001; October 24 and 30, 2001; and January 3, 9, and 10 of 2002. In addition, Tiedemann was absent for part of the day on September 12, 2001, October 4, 2001, and January 7, 2002. (Dep. of Tiedemann 178-80; Mayo Aff. Exs. 1 and 2.) Tiedemann was counseled by Mayo on the issue of her attendance, and throughout the course of Plaintiff's temporary assignment at Honda, Mayo reminded her of Honda's expectations concerning regular attendance and counseled her to reduce her absenteeism. (Dep. of Tiedemann 118; Mayo Aff. ¶ 14.) Nevertheless, Tiedemann's absenteeism problem persisted and worsened. (Mayo Aff. ¶ 14.)

Plaintiff's job performance at Honda was also below company expectations. In Plaintiff's job as OSA to Mayo, it was important to exercise care, pay attention to detail, and not make mistakes. (Dep. of Tiedemann 165.) It was also important for Tiedemann to be a self-starter and work independently so that Mayo did not have to give her instructions or follow-up with her constantly. (*Id.* at 166.) Nevertheless, during Plaintiff's temporary assignment, she exhibited several performance deficiencies, including the following: (1) she did not check her work; (2) she focused on speed rather than quality; (3) she made the wrong color copies; (4) she typed the minutes of the weekly manager's meetings incorrectly; (5) she made mistakes putting together book titles; (6) she did not take extra steps to ensure quality; (7) she made multiple mistakes on a business plan; (8) she incorrectly typed schedule modifications; (9) she failed to send out meeting minutes on the designated day; and (10) she was unable to find documents that Mayo requested. (Mayo Aff. ¶ 15,

35

Ex. 2.)[69]  In fact, Tiedemann admits that on numerous occasions Mayo expressed his dissatisfaction with her work product and discussed her work problems with her on several occasions.  (Dep. of Tiedemann 166-78, 257-58.)[70]  Kinsey also observed that Tiedemann made numerous errors in performing her tasks, and based on his observations, formed an opinion that Plaintiff's performance as an OSA was poor.[71]  (Kinsey Aff. ¶ 21.)

On at least two occasions, Tiedemann met with Mayo and asked him why she had not yet been hired as a regular, full time associate at Honda. (Mayo Aff. ¶ 16.) On those occasions, Mayo reminded Tiedemann that as a temporary associate, there was no guarantee of regular employment at Honda, and that Plaintiff's attendance had been so poor that she would have lost her job at Honda had she already been a regular associate, based on Honda's "no fault" point system attendance policy.[72] (Mayo Aff. ¶ 16.)

_____

[69] Although Tiedemann disputes these deficiencies and cites her affidavit in support of the dispute, the affidavit presents no evidence indicating that Tiedemann did not make these errors as indicated. (*See also* Dep. of Tiedemann 166-75.) The court agrees with Defendants that there is no dispute in the record as to this point, and therefore these statements are undisputed for summary judgment purposes. (*See* Doc. #80 at 19.)

[70] Plaintiff states that she disputes this fact and cites her later filed affidavit in support of the dispute. However, Plaintiff's deposition contains no statement disputing that Mayo was unhappy with Tiedemann's work. The affidavit only states that Mayo said he would see Tiedemann when she returned from being absent from work. (Tiedemann Aff. ¶ 6.)

[71] While Tiedemann has not admitted this fact, the evidence provided by Defendants for summary judgment purposes shows that Kinsey had formed an opinion that Tiedemann's work product was poor, and Tiedemann has offered no contrary evidence. Therefore, this statement is undisputed for summary judgment purposes. (*See* Doc. #80 at 20.)

[72] While Tiedemann has not admitted this fact, the evidence provided by Defendants for summary judgment purposes shows that Mayo told Plaintiff that her attendance was poor, and Tiedemann has come forth with no contrary evidence. The court agrees with Defendants that this fact is undisputed for summary judgment purposes. (*See* Doc. #80 at 21-2.)

On March 20, 2002, Plaintiff began a medical leave of absence from Honda. (Dep. of Tiedemann 21.) She alleges that at the time she left Honda to have the surgery, Mayo told her "everything will be fine and we'll see you when you get back." (*Id.* at 274.)[73] However, Mayo decided that Honda would not continue to Tiedemann's temporary employment at Honda and also decided not to hire Tiedemann as a regular full time Honda associate. (Mayo Aff. ¶ 14; Dep. of Tiedemann 150, 377.) Darrell Walker called Tiedemann and informed her that Honda did not want her to return to work. (Tiedemann Aff. ¶ 7.)[74]

### 2.    Facts Applicable to Tiedemann's Hostile Work Environment Claim

Plaintiff Tiedemann alleges that during the time of her temporary employment at Honda, she was harassed by Mayo and Chickerella because she was not thin and blonde.[75] More specifically, Tiedemann alleges that Mayo and Chickerella harassed her by: (1) not paying enough attention to her; (2) calling her nicknames and cursing in her presence; and (3) commenting about "thin blonde" women. (Dep. of Tiedemann 195-200, 219-20, 225-28, 365-67.)

---

[73] Defendants allege that this testimony is inconsistent with Tiedemann's affidavit, which states that Mayo told Tiedemann that she would have a job when she was ready to go back to work. (*See* Doc. #79 at 13-4.) The court finds that these statements are not inconsistent and therefore will consider both for summary judgment purposes.

[74] While Defendants attempt to have this statement stricken on grounds that it is hearsay, the court will consider this statement for summary judgment purposes due to the effect it likely had on Tiedemann. (*See* Doc. #79 at 15-6.)

[75] While Tiedemann states that she disputes this fact and cites to her affidavit in support of her contention, the affidavit provides no insight as to why Tiedemann believed she was being harassed. Tiedemann's affidavit does state, however, that she weighed approximately 250 pounds and was 5'6" at the time she was hired as a temporary associate at Honda. (Tiedemann Aff. ¶ 2.) In contrast, Tiedemann states clearly in her deposition that she believed that Chickerella "had something against" her because she was not thin and blonde. (Dep. of Tiedemann 153.) Tiedemann later in her deposition again states that she is suing Honda for weight discrimination. (*Id.* at 215.)

Plaintiff claims that Mayo called her "Teeterman, Teetertotter, or Tatertot." (*Id.* at 195.) She states that a Tatertot is a short, fat potato and that a Teetertotter is a seesaw,[76] (*id.* at 195-96; Tiedemann Aff. ¶ 4), and that she believes that Mayo was making fun of her because she was relatively short and overweight (Tiedemann Aff. ¶ 4.)[77] While Tiedemann admits that Mayo used nicknames when addressing other Honda employees, both male and female, (Mayo Aff. ¶ 11), she does not believe that she had a high comfort level with Mayo nor does she believe that she was friends with Mayo (Tiedemann Aff. ¶ 4.) Plaintiff believes that the only appropriate names for Mayo to refer to her as were Ms. Tiedemann or Kim. (Dep. of Tiedemann 213.)

Plaintiff also claims that Mayo used profanities at work **every day**, every where, and around everyone, both men and women. (*Id.* at 183, 185-87.) In fact, the Plaintiff claims that curse words were a part of Mayo's normal vocabulary and that Mayo had a foul mouth in general. (*Id.* at 184-85.) Plaintiff alleges that Mayo directed **only one** curse word at herself, but it was not done in an threatening way.[78] (*Id.* at 192, 194.) Overall, Tiedemann is complaining about Mayo's cursing

---

[76] In her deposition, Tiedemann explained the conversation that led up to the nickname to be as follows: "[He] said I am going to give you a nickname. I said ok, why. Oh, just because I want to. I said ok. He said, well, I'm going to call you boss lady and I said why. He said I just want to give you a nickname. He goes, but that sounds like you have too much power. He goes, so let's see, your name begins with a T, maybe we can do something like bacon, lettuce, tomato. And I said I do not want to be referred to as produce or pork. And then he came up with – he said, well, Tiedemann. He said I like teetertotters when I was a kid, why don't we call you a Tatertot." (Dep. of Tiedemann 198-99.) While Tiedemann asserts her disagreement with this statement, she cites only her affidavit as contrary evidence, which makes no mention as to how the nickname came about. Therefore, the court finds this conversation to not be in dispute, and will be considered for summary judgment purposes. (*See* Doc. #80 at 19.)

[77] While Defendants attempt to have this statement stricken, the court finds that it is based on more than mere conclusory allegations and therefore will consider it for summary judgment purposes. (*See* Doc. #79 at 14.)

[78] Specifically, Tiedemann alleges that Mayo said, "If you were a good secretary, you would be cleaning my damn desk." (Dep. of Tiedemann 192.)

because she does not believe that such language should take place in the workplace.  (*Id.* at 186.)

Plaintiff also claims that she overheard Mayo ask Christa Griffith at Darrell Walker if applicants for temporary employment at Honda were "thin and blonde."  (*Id.* at 221-22, 226.) Tiedemann also claims that one day a female associate with brown hair highlighted blonde walked by, and Mayo said, "Oh, the things I could do to her." (*Id.* at 223, 229.)

In support of her hostile work environment claim, Tiedemann asserts that Chickerella and Mayo did not pay enough attention to her at work.  More specifically, Plaintiff claims that when she asked Chickerella a question, he would disregard it or answer it very quickly, while for other individuals, Chickerella would sit down and answer their questions thoroughly. (*Id.* at 219.)  When Tiedemann would ask Mayo a question, he allegedly was very vague and fast in giving his answer. (*Id.* at 228.)  Moreover, Plaintiff is complaining because Mayo joked more with other men and women than he did with her,  (*id.* at 303-04), and because Mayo and Chickerella were more playful with other females than they were with her (*id.* at 365-67.)  Simply stated, Tiedemann wanted Mayo and Chickerella to pay more positive attention to her.  (*Id.* at 367.)

### 3.    Tiedemann's Alleged Comparators

Plaintiff believes that April Reddick and co-plaintiff Amy Thornton, who were thin, blonde, female OSAs, were treated better than her because they were hired as regular Honda associates and they were talked to more, praised more, and generally treated better by Chickerella and Mayo.  (*Id.* at 313.)  More specifically, Plaintiff believes that Thornton and Reddick were treated better at Honda because of their weight and hair color.  (*Id.* at 313-14.)  Plaintiff advances no evidence that Honda applied a different standard to men than it did to women when it came to weight or hair color.

39

(*Id.* at 314, 318.)[79]   Moreover, there were obese men and women who worked in the PORD

department, (*id.* at 314-18), and temporary and regular OSAs hired into the Purchasing Department

of PORD at Honda have not been exclusively thin and/or blonde (Mayo Aff. ¶ 7.)[80]

### 4.     Facts Applicable to Tiedemann's Retaliation Claim

On November 28, 2001, Tiedemann met with Vickie Vaughan in AR primarily to find out

if she was going to be hired as an associate by Honda. (Dep. of Tiedemann 259; Vaughan Aff. ¶ 5,

Ex. 1.)[81]   Plaintiff expressed her desire to be hired as a full time associate at Honda, despite the

alleged harassment by Mayo and Chickerella. (Dep. of Tiedemann 259-60.) She expressed concern

that she was receiving conflicting responses from Chickerella, Mayo, and Darrell Walker as to

whether she was going to be hired by Honda as a permanent, full time employee.[82]   (*Id.* at 260;

Vaughan Aff. Ex. 1.)  In addition, Tiedemann complained to Vaughan that she felt that she was

---

[79] Although Plaintiff denies this fact in her Response to Defendants' Statement of Facts, she cites only her affidavit in support of the dispute.  However, this affidavit, filed after Tiedemann's sworn deposition testimony, advances no evidence that men were treated more favorably than women at Honda.  Therefore, the court agrees with Defendants that there is no dispute in the record as to this point.  (*See* Doc. #80 at 19-20.)

[80] Although Tiedemann has not admitted this latter fact, the evidence submitted by Defendants for summary judgment purposes shows that all associates hired were not thin and/or blonde, and Tiedemann has produced no contrary evidence.  Therefore, this fact will be considered admitted for summary judgment purposes.

[81] Although Plaintiff denies this fact in her Response to Defendants' Statement of Facts, she cites only her affidavit in support of the dispute.  However, this affidavit, filed after Tiedemann's sworn deposition testimony, advances no evidence on the conversation with Vaughan, other than to state that Mayo saw Tiedemann talking with Vaughan.  Therefore, the court finds that there is no dispute in the record as to this point.

[82] Plaintiff told Vaughan that the responses she would get when she asked about her future with Honda would be: (1) not everyone gets hired by Honda; (2) they have not thought that far ahead yet; and (3) the position has not been approved yet. (Dep. of Tiedemann 261; Vaughan Aff. Ex. 1.)

being treated differently because she was not thin and blonde like the other OSAs in her department, April Reddick and Amy Thornton.[83]   (Dep. of Tiedemann 232-33, 255, 262-63.)   She also complained to Vaughan that she overheard Mayo ask Darrell Walker what applicants looked like and how old they were when requesting temporary employees. (*Id.* at 233.)  At no time during the conversation with Vaughan did Tiedemann complain that Mayo cursed or acted inappropriately with her; she did not indicate that she believed she was being discriminated against because of her gender; nor did she indicate that she believed she had been sexually harassed by anyone. (*Id.* at 384-85; Vaughan Aff. ¶¶ 5, 11, 12, 13, 15, Ex.1.)  Vaughan told Tiedemann she would investigate her concerns and follow up with her. (Vaughan Aff. ¶ 5.)

Later on November 28, Tiedemann saw Vaughan talking to Mayo and Chickerella; she thereafter approached Vaughan again and told her that she was concerned that she had done the wrong thing by complaining to Vaughan. (Dep. of Tiedemann 268.)  Plaintiff asked Vaughan what she, Chickerella, and Mayo had talked about, and Vaughan responded that she had briefly relayed Plaintiff's concerns to them. (Id. at 268-69; Vaughan Aff. Ex. 1.)  Vaughan assured Tiedemann that she had not erred by bringing a concern to the AR department. (Dep. of Tiedemann 269; Vaughan Aff. Ex. 1.)

Later the same day, Mayo asked Tiedemann what she had told Vaughan. (Dep. of Tiedemann 240, 245.)  Plaintiff told him that she had told Vaughan that she felt that she was being discriminated against because she was not blonde and skinny. (*Id.* at 240, 246.)  Mayo then allegedly responded, "You can tell them what you want, but it's your word against mine and I'm

---

[83] Tiedemann told Vaughan that she had observed Chickerella and Mayo asking Reddick and Thornton how their weekend had been and being conversational with them and ignoring everyone else. (Dep. of Tiedemann 264.)

41

going to win." (Id.) He also allegedly told Tiedemann that he would hire her on his own time. (Id. at 244-45.) However, Plaintiff did not report these alleged remarks to Vaughan or anyone else at Honda. (Id. at 241, 244, 250-51, 385.)

To investigate Tiedemann's concerns, Vaughan met with Linda Bailey and Rick Mayo. (Vaughan Aff. ¶ 6.)[84]  Mayo told Vaughan that Tiedemann's status as a temporary employee was no assurance of permanent employment and whether or not Tiedemann would be hired would be measured by her job performance, ability to maintain regular attendance, and the hiring needs of the department where Tiedemann worked. (Id.)[85]  During the course of the investigation, Vaughan learned that Tiedemann had missed an excessive number of days at work, and her employment would probably have been terminated already through Honda's "no fault" point system had she been a regular full time Honda associate. (Id. at ¶ 7.)[86]  Vaughan understood that Tiedemann's poor attendance at work would continue to hamper her effort to obtain full time employment at Honda, but saw no indication that Tiedemann's height and hair color were hampering her chances of being hired full time at Honda. (Id.)[87]

The next day, November 29, Vaughan explained to Tiedemann that she was a temporary employee and that there was no guarantee of permanent employment with Honda. (Dep. of

---

[84] Although Tiedemann has not admitted this fact, the evidence provided by Defendants for summary judgment purposes shows that Vaughan did in fact meet with Bailey and Mayo, and Tiedemann has come forward with no contrary evidence. Therefore, the court agrees with Defendants (see Doc. #80 at 22) that this fact is undisputed.

[85] Although Tiedemann has not admitted this fact, the evidence provided by Defendants for summary judgment purposes shows its veracity, and Tiedemann has come forward with no contrary evidence. Therefore, this fact will be considered undisputed for summary judgment purposes.

[86] See id.

[87] See id.

Tiedemann 251.)  Tiedemann was not surprised to hear this.  (*Id.* at 254, 379-80.)  Vaughan told

Tiedemann that factors such as attendance and hiring needs are taken into account when deciding

whether to offer full time employment to temporary associates.  (*Id.* at 251.)  Tiedemann responded

that her main concern was that she felt like she was wasting her time and so she asked Vaughan if

she should speak to Mayo about her future.  (*Id.* at 252.)  Vaughan offered Tiedemann two

alternative suggestions: (1) that Plaintiff talk to Mayo and convey in a professional manner what her

concerns were and then focus on doing her job; and/or (2) that Plaintiff not talk to Mayo, focus on

her job, and see what happened.  (*Id.* at 253.)  Plaintiff chose the first option and spoke to Mayo

about her future at Honda. (Vaughan Aff. Ex. 1.)[88]  Mayo's response was that Tiedemann needed

to correct her unsatisfactory attendance and improve the quality of her work to become a regular

Honda associate.  (Mayo Aff. ¶ 16.)[89]

    Although Tiedemann told Vaughan that she wanted to let her concern about thin blonde

women go, (dep. of Tiedemann 235-36, 241, 244, 250-51), Bailey and Vaughan investigated this

concern anyway and visually observed the physical appearance of those who had been hired into the

Purchasing Department (Bailey Aff. ¶ 36; Vaughan Aff. ¶ 6.)[90]  Bailey and Vaughan observed that

the department was not populated exclusively or even predominantly by thin blondes, and in fact

observed that both temporary and regular associates in the Purchasing Department had a variety of

hair colors and body sizes.  (Bailey Aff. ¶ 36.)[91]

--------

[88]  *See id.*

[89]  *See id.*

[90]  *See id.*

[91]  *See id.*

Thereafter, Tiedemann made no further complaints to AR or management at Honda. (Dep. of Tiedemann 302.) While Plaintiff claims that she was not hired as a permanent Honda employee because she complained about Mayo and Chickerella's conduct to Vaughan, (*id.* at 240, 246, 273-75), she does not dispute that there were other temporary employees not hired on a full time basis by Honda. (*Id.* at 383.) In addition, Vaughan never informed Mayo that Tiedemann had expressed any concern or made any complaint about his nickname for her, use of profanity, preference for hiring thin blondes, or sexually explicit jokes. (Mayo Aff. ¶ 17.)[92]  Vaughan only told Chickerella and Mayo that Tiedemann had inquired about obtaining regular employment with Honda. (Vaughan Aff. ¶ 17.)

### E.   Facts Applicable to Claims Asserted by Amy Thornton

In March 2001, Thornton applied for employment with TRI[93] and after an interview with Chickerella and Jim Small, Team Manager of Production Materials Control,[94] she was assigned to work as an OSA in the Maintenance, Repair, and Operations ("MRO") area of the Purchasing Department of Honda on March 26, 2001. (Dep. of Thornton 53, 57-58, 79.) Plaintiff claims that during the interview, Chickerella told her that he was impressed with her and would like for her to become a regular, full time Honda associate, but she would first need to work as a temporary employee for ninety days. (*Id.* at 87-88.) Thornton also claims that Chickerella told her he wanted

---

[92] *See id.*

[93] TRI explained that during her temporary employment, Thornton would remain a TRI employee but would be later eligible for employment at Honda. (Dep. of Thornton at 81.)

[94] According to Thornton, everyone acted appropriately during the interview. (Dep. of Thornton 84-5.) Plaintiff acknowledges that someone wrote on her application that she had high school plus two years of college and that her experience in purchasing was primarily data entry. (*Id.* at 85.)

her to learn about the Honda Buyer positions.[95]  (*Id.* at 89.) Plaintiff understood that her temporary position was not a Buyer position.  (*Id.* at 93-94.)

On August 6, 2001, Honda hired Thornton as a regular, full time OSA associate.  (*Id.* at 226, 509.) At that time, she received Honda's Associate Handbook and became familiar with the policies contained therein.  (*Id.* at 134-35.)[96]

### 1.    Facts Applicable to Alleged Harassment of Thornton by Chickerella

Plaintiff Thornton alleges that Chickerella harassed her by: (1) using profanities; (2) making sexually tinged comments; (3) engaging in inappropriate touchings; (4) using sexually tinged body language; (5) inviting her on "dates;" and (6) calling her at home.  (*See* Pls.' Brief in Opp'n. to Defs.' Motions for Summ. J. at 8-9.) Thornton claims that Chickerella began this harassment when she began her temporary assignment at Honda on March 26, 2001, and that the harassment stopped approximately two weeks before Thornton became a regular Honda associate on August 6, 2001. (Dep. of Thornton 106, 131-34, 417-19.)

---

[95] Thornton testifies in her deposition that Chickerella told her he was putting her in the Purchasing Department "to learn and to watch how Honda . . . the buyer, the buyer positions worked there, how the confidentiality agreements, the master services agreements, all the different agreements that are confidential, that only a Honda associate and a supplier would go over and sign." (Dep. of Thornton 89.) For purposes of summary judgment, the court notes that Thornton was placed in the Purchasing Department not because she had to learn about the Buyer position before she could become a Buyer, but so that she could watch and learn about the Buyer position. (*See* Doc. #80 at 4.)

[96] For summary judgment purposes, the court specifically finds that Thornton received Honda's Associate Handbook but sees no evidence that Thornton was trained on the Mutual Respect Policy. (*See* Doc. #80 at 5.)

Thornton claims that Chickerella used profanities and yelled at both male and female associates at Honda.[97] (*Id.* at 381-85, 389-90.) However, she notes that while Chickerella engaged in this conduct on a regular basis, he did not single out Thornton for her special attention when it came to using foul language. (*Id.* at 381-82.)

Thornton also alleges that Chickerella constantly implied through his words and actions that he wanted to engage in sexual intercourse with her. (*Id.* at 383.) Specifically, Thornton testifies that **one time** Chickerella told her to reorder new pants because hers were too baggy and needed to be tighter around her buttocks area.[98] (*Id.* at 414, 454-55.) After Chickerella made this comment, Thornton went to have herself re-fitted for uniform pants, and thereafter received new pants which were tighter in the waist. (*Id.* at 460-62.) On **one other occasion**, Chickerella whispered in Thornton's ear that she was his "favorite girl."[99] (*Id.* at 449.) Thornton did not feel comfortable with what Chickerella said nor with how he said it. (*Id.* at 451.) In addition, approximately **thirty to forty times within the first three to four months** of Thornton's assignment at Honda, Chickerella told Thornton that she was beautiful when no one else was around. (*Id.* at 113-14, 126-

---

[97] Defendant Chickerella denies that he often used profanities in the workplace but admits that it is possible that he used one profanity loud enough for Thornton to overhear. *See* Movant's Submission in Response to Exhibit "A" of the court's Order at 13-14. Since this is a material fact in dispute, the court will proceed considering the facts in the light most favorable to Thornton.

[98] Defendant Chickerella denies that he made this comment. *See* Movant's Submission in Response to Exhibit "A" of the court's Order at 14-15. Since this is a material fact in dispute, the court will proceed considering the facts in the light most favorable to Thornton.

[99] Defendant Chickerella denies that he made this comment. *See* Movant's Submission in Response to Exhibit "A" of the court's Order at 14. Since this is a material fact in dispute, the court will proceed considering the facts in the light most favorable to Thornton.

27, 418.)[100]  The first few times Chickerella told Thornton she was beautiful, she responded with a "thank you," (*id.* at 427), and was not offended until after Chickerella had made this comment several times. (*Id.* at 128.)

Chickerella continued to make comments to Thornton.  Approximately **every day** Chickerella would tell Thornton that he loved the way she dressed and the clothes that she wore.[101] (*Id.* at 114.)  More specifically, Thornton testifies that Chickerella would tell her that what she was wearing brought out her body, that she needed to wear certain outfits more often, that he had never seen anyone else dress the way she did, and that she had good taste in clothing.[102]  (*Id.* at 129-30.) About half of the times Chickerella would make these comments, Thornton would reply with a "thank you." (*Id.* at 429.)  In fact, at first Thornton thought Chickerella just liked the way she dressed, but after awhile she began to think that he was coming on to her.  (*Id.* at 129.)

In addition, Chickerella would whisper in Thornton's ear that he liked the way she walked and looked from behind.[103]  (*Id.* at 114-15.)  Similarly, in August 2001, Thornton claims that

---

[100] Defendant Chickerella denies that he often told Thornton that she was beautiful. *See* Movant's Submission in Response to Exhibit "A" of the court's Order at 10-11. Chickerella alleges that on four or five occasions he told Thornton that she looked nice that day, but never told her she was beautiful. *Id.* Since this is a material fact in dispute, the court will proceed considering the facts in the light most favorable to Thornton.

[101] This was before Thornton was required to wear the company uniform. (Dep. of Thornton 129.)

[102] Defendant Chickerella denies making these comments. *See* Movant's Submission in Response to Exhibit "A" of the court's Order at 11. Since these are material facts in dispute, the court will proceed by considering the facts in the light most favorable to Thornton.

[103] *See id. See also See* Movant's Submission in Response to Exhibit "A" of the court's Order at 11-13.

Chickerella told her that her buttocks looked good when she ran.[104]  (*Id.* at 124.)  Chickerella had

seen Thornton jogging through the parking lot.  (*Id.* at 446-47.)  Thornton feels that the sum effect

of these comments was harassment, despite the fact that she did things to make herself more

attractive.[105]  (*Id.* at 435, 517-23.)

Thornton also claims that **ten to fifteen times** while sitting next to her, Chickerella would

lean up and put his arm around her chair so that his arm touched her back and "more or less" rub her

back.[106]  (*Id.* at 144, 168-69.)  When this would happen, Thornton would lean up and give

Chickerella a look or excuse herself to go to the restroom.  (*Id.* at 144, 169-70.)  Chickerella also

touched Thornton when he whispered in her ear and brushed his nose against Thornton's hair

**approximately twenty times**.  (*Id.* at 173, 477.)[107]  While sometimes the topic of the whisper would

be work-related, Thornton was offended by the conduct and resultant touching.  (*Id.* at 122-23, 173-

74.)  In response to the conduct, Thornton would lean away from Chickerella.  (*Id.* at 174.)

Plaintiff Thornton also contends that **approximately five to ten times** when she was sitting

at her workstation, Chickerella stood with his legs next to her chair, bent over, and touched her

---

[104] *See* footnote 101, *supra*. *See also* Movant's Submission in Response to Exhibit "A" of the court's Order at 12.

[105] The evidence shows that Thornton had a breast augmentation, colored her hair blonde, and often re-applied her make-up at her desk at work.  (Dep. of Thornton 517-23; Dep. of Tiedemann 308-09.)

[106] Defendant Chickerella denies engaging in such conduct. *See* Movant's Submission in Response to Exhibit "A" of the court's Order at 15-16.  Since this is a material fact in dispute, the court will proceed by considering it as stated by Thornton.

[107] Defendant Chickerella denies that his nose ever touched Thornton's hair when he whispered in her ear. *See* Movant's Submission in Response to Exhibit "A" of the court's Order at 16.  Since this is a material fact in dispute, the court will proceed by considering it in the light most favorable to Thornton.

upper arm with his thigh. (*Id.* at 175-77.) Approximately **five to seven additional times**, Chickerella's forearm or elbow would brush up against Thornton's breasts when he was standing next to her chair. (*Id.* at 347-50.)[108] When Chickerella engaged in this conduct, Thornton pulled away or leaned over to give him more space. (*Id.* at 176, 180-82, 349.)

Additionally, Plaintiff contends that Chickerella would **frequently** grab her hair and pull it backwards when he passed her desk.[109] (*Id.* at 145, 187.) In response, Thornton would shake her head because she was frustrated and irritated, and a few times she asked Chickerella to stop. (*Id.* at 188.) In addition, **five or six times** Chickerella put his arms around Thornton and April Reddick, and called them the "A Team."[110] (*Id.* at 191.) When Thornton would pull away from Chickerella, he would remove his arm. (*Id.* at 191-92.)

Plaintiff alleges that Chickerella's body language was also sexually harassing. (*Id.* at 107, 195.) While Thornton was sitting in her chair facing her workstation, Chickerella would, **approximately fifty to seventy times,** pull his chair next to hers so that his body was facing her and put his legs on each side of her chair; he would also slouch down in his chair and lean back with his

---

[108] Chickerella denies that these touchings occurred. *See* Movant's Submission in Response to Exhibit "A" of the court's Order at 16-17, 19-20. Since these are material facts in dispute, the court will proceed by considering them in the light most favorable to Thornton.

Plaintiff does admit, however, and the court will consider, that for Chickerella to look at Thornton's computer screen, he had to lean over Thornton. (Dep. of Thornton 497.) Plaintiff also admits, and the court considers, that Chickerella would lean over both male and female employees at their work areas in order to point things out on their computer screens and look at their computers. (*Id.* at 179.)

[109] Defendant Chickerella denies this occurrence. *See* Movant's Submission in Response to Exhibit "A" of the court's Order at 17-18. Since this is a material fact in dispute, the court will proceed with the analysis by stating the facts in the light most favorable to Thornton.

[110] *See* footnote 101, *supra*. *See also* Movant's Submission in Response to Exhibit "A" of the court's Order at 18.

hands behind his head.  (*Id.* at 149-50.)  **Two of these times**, Thornton observed that while Chickerella was sitting next to her, he had an erection as evidenced by something poking up in his pants.[111] (*Id.* at 149, 152-53, 156, 160-61, 469-71, 474.) The first time this occurred, Thornton acted like she did not see the erection; the second time she saw it, she excused herself and went to the restroom.  (*Id.* at 160-61.)  According to Thornton, Chickerella stopped sitting in the position described because he realized that she was not going to accept it.  (*Id.* at 152.)

Finally, Thornton alleges that she was harassed when Chickerella invited her on "dates" and called her at home. (*See* Pls.' Brief in Opp'n. to Defs.' Motions for Summ. J. at 8-9.) **Three times** Chickerella invited Thornton to have coffee with him at Waffle House.[112] At the first breakfast meeting, Chickerella asked Thornton what she did for fun after work. (*Id.* at 119, 442.) After Thornton responded that she spent time with her children, Chickerella asked Thornton to show him around some weekend, particularly to fun places to have a drink after work. (*Id.* at 119, 213-14.) Thornton responded that she didn't get out much. (*Id.* at 120.) Next Chickerella asked Thornton who she was dating. (*Id.* at 120.) This conversation made Thornton uncomfortable because she did not think it was appropriate for a supervisor to ask an employee to take him out and show him around. (*Id.* at 120, 122, 214.)

At the second breakfast meeting, Chickerella and Thornton mainly discussed another temporary employee, Jessica, who was under suspicion for stealing computers. (*Id.* at 217-19.)

---

[111] *See* footnote 101, *supra.* *See also* Movant's Submission in Response to Exhibit "A" of the court's Order at 18-19.

[112] Thornton does not dispute that Chickerella met with male associates for breakfast at Waffle House, nor does she dispute that it was not unusual for Honda associates to go to the Waffle House to talk business. (*Id.* at 207-08.)

However, Chickerella also asked Thornton what she had done the past weekend and what she had planned for the coming weekend; Thornton did not respond because she felt that those were inappropriate inquiries. (*Id.* at 219-20.)

On the third occasion, Chickerella called Thornton early in the morning at home and told her that he needed to talk to her about Kim Tiedemann's performance. (*Id.* at 221-23.) Plaintiff agreed to meet with Chickerella, and while the two did discuss Tiedemann's performance, Chickerella also brought up the fact that he was going to move his wife and children to Alabama before Christmas. (*Id.* at 220.) Chickerella did not discuss anything else personal with Thornton during the third breakfast. (*Id.* at 226-27.)

In addition, **two times** Chickerella asked Thornton if she would like to have dinner with him. (*Id.* at 231.) Thornton declined these invitations by telling Chickerella that she had to pick her children up from daycare, and Chickerella did not discuss the subject any further after Thornton declined the offer. (*Id.* at 232.) However, Thornton did feel compelled to accept an invitation to go to the Cropwell Pub & Grill with Tara Vick, April Reddick, and Chickerella in August 2001, although Chickerella did not tell the women that they had to accompany him to the bar. (*Id.* at 234-35, 237.) Chickerella did, however, put his arm around Thornton and Reddick and tell them, "we're going to Cropwell." (*Id.* at 237.) Thornton does not allege that Chickerella engaged in any inappropriate conduct while she was at Cropwell. (*Id.* at 242.)

Finally, Thornton claims that Chickerella harassed her by calling her at home **three times**. (*Id.* at 195, 197, 203-04.)[113]  The first time, Chickerella called Thornton between 8:30 and 9:00 at

---

[113] Chickerella denies that he ever called Thornton at home. *See* Movant's Submission in Response to Exhibit "A" of the court's Order at 20.  Since this fact is in dispute, the court, for purposes of summary judgment, states the facts in the light most favorable to Thornton.

night from the Huddle House and asked her to meet him there for coffee; Plaintiff declined but asked Chickerella if anything was wrong. (*Id.* at 197-201.) Chickerella responded that he just had some free time and asked if Thornton would meet him later. (*Id.* at 201.) Plaintiff declined that request as well. (*Id.*)

Chickerella called Thornton at home again twenty to thirty days later. (*Id.* at 203.) It was between 7:30 and 8:00 in the morning, and Chickerella wanted to confirm that the two were meeting for breakfast. (*Id.* at 204.) Nothing else was said during the second phone call. (*Id.* at 205.) However, on the occasion of the third phone call at 9:00 at night, Chickerella told Thornton that he needed to meet her right away to discuss something very important. (*Id.* at 205.) Plaintiff declined, telling Chickerella that it was her children's bedtime and that she would talk to him in the morning. (*Id.* at 206.) Thornton never did find out what Chickerella wanted to talk about, even though the next day at work she asked Chickerella if they needed to have a conference to discuss what it was he needed to talk to her about the previous evening. (*Id.* at 205.)

According to Thornton, the harassment she experienced ended approximately two weeks before she became a full time Honda associate, primarily because she avoided Chickerella. (*Id.* at 171-72.)[114]

### 2.    Thornton's Response to the Harassment

Before she began working at Honda as a temporary associate, Thornton understood that sexual harassment was against the law and that if she felt she had been sexually harassed, she should

---

[114] Though Thornton denies this latter fact in her Response to Defs.' Statement of Facts, she cites no evidence to the contrary. Similarly, Thornton admits this same fact earlier in her Response. Therefore, the court agrees with Defendants that this fact is admitted for summary judgment purposes. (*See* Doc. #80 at 5.)

report that harassment. (*Id.* at 61-3.)  In fact, when Thornton became a temporary associate at Honda, she understood that it was wrong for someone to sexually harass her and she knew that it she was harassed, she should report that harassment to management. (*Id.* at 136.)  When Thornton became a regular full time Honda associate, she received a copy of the Associate Handbook, which contained the Mutual Respect Policy. (*Id.* at 134-35.)

Despite Thornton's knowledge that sexual harassment is illegal, she never complained to any member of management at Honda that Chickerella sexually harassed her because she believed that if she complained, she would lose her job. (*Id.* at 127-28, 136-37.)[115]  In addition, Plaintiff is not aware of any member of management at Honda who observed Chickerella engaging in any inappropriate conduct. (*Id.* at 175.)

### 3.  Facts Applicable to Thornton's Retaliation Claim

Plaintiff Thornton claims that Chickerella retaliated against her because she refused his sexual advances. More specifically, Thornton claims that she was: (1) denied a Buyer position; (2) assigned less favorable job duties; and (3) humiliated. Ultimately, Thornton resigned from her position at Honda. (Dep. of Thornton 507, 563.)

Thornton believes that there was a connection between her inability to get a Buyer position at Honda and not wanting to date Chickerella because: (1) she said no when he asked her out to dinner; (2) she moved away from him when he got close to her; (3) she began to avoid him; and (4) she is young. (*Id.* at 250-51.) Honda's position is that Thornton was simply not as qualified as other

---

[115] Though Thornton denies this fact in her Response to Defs.' Statement of Facts, she cites no evidence to the contrary.  Similarly, Thornton readily admits that she did not report the conduct because she was afraid she would lose her job at Honda.  Therefore, the court agrees with Defendants that this fact is admitted for summary judgment purposes. (*See* Doc. #80 at 5.)

employees for the position of Buyer.

A Buyer's duties include: evaluating and selecting potential Honda suppliers, assessing the purchasing needs of Honda, visiting potential and actual suppliers, developing Honda's commodities strategy, and analyzing financial and product information from prospective suppliers to determine whether bids are realistic and in line with Honda's expectations and purchasing strategy.[116] (Watkins Aff. ¶ 3.)   While Thornton did not graduate from high school, she did take some basic classes at Jefferson State Community College and attended training on Microsoft and Excel. (Dep. of Thornton 32-34, 38-39.)   Thornton's resume, provided to Honda with her application for employment, reveals that she worked in inside sales assisting customers, and as a customer service manager which required performing some purchasing duties at Residential Construction Specialties, i.e. controlling inventory and measuring inventory.[117]  (Id. at 47-48, 62, 64-65.)

Thornton asserts that she was qualified to be a Buyer at Honda because of her previous work history and the tasks that she did during the time she was temporarily assigned to Honda. (Id. at 270.)   During her temporary assignment, Thornton performed some Buyer duties, including evaluating and selecting suppliers, obtaining price quotes from suppliers, and printing purchase orders and sending them to suppliers. (Id. at 269-70.)   However, the vast majority of Thornton's duties involved typical OSA clerical duties, such as filing, faxing, typing, answering telephones, and printing out purchase orders. (Watkins Aff. ¶ 6.)[118]  Plaintiff admits that she was never called a

---

[116] The list provided is a sampling of duties of a Honda Buyer.  (Watkins Aff. ¶ 3.)

[117] Plaintiff would take the appropriate amount of merchandise needed for the year, divide that by twelve, and look at the amount of items that her employer had in stock which would in turn tell her how many more supplies the employer would need for the year. (Dep. of Thornton 68.)

[118] Although Thornton attempts to deny this fact, Defendants have presented evidence establishing the fact as true and Thornton has presented no evidence to the contrary. Therefore, the

Buyer and was never paid as a Buyer. (Dep. of Thornton 94-95.)  She also concedes that Honda used a completely different approach to purchasing than the approach used by her prior employer. (*Id.* at 288.)  Further, Thornton admits that the Buyer job at Honda was one of the most demanding purchasing jobs "on the planet." (*Id.* at 542.)  Although Buyer positions became available during her tenure at Honda, Thornton was not interviewed yet she trained the new Buyers when they began working in that capacity at Honda. (*See* Pls.' Brief in Opp'n. to Defs.' Motions for Summ. J. at 9.)

### a.  Thornton's Attendance Record While at Honda

Once Plaintiff became a regular full time Honda associate, she was subject to the company's attendance policy. (Dep. of Thornton 296.)  Thornton understood that this policy was "no fault," which meant that she was only allowed a certain number of absences regardless of the reason for the absences.[119] (*Id.* at 297.)  Under that policy, Thornton accumulated twelve points and was issued a verbal warning for attendance problems on September 14, 2001. (*Id.* at 299-300.)  Turner met with Thornton and communicated to her all of the information contained in the verbal warning. (*Id.* at 300-01.)  Because Thornton's attendance did not improve, she received a Level 2 written counseling on October 12, 2001, which was signed by Thornton, Linda Bailey, Henry Turner, and Chickerella. (*Id.* at 302, Ex. 8.)[120]  On January 14, 2002, Turner and Freddie Thomas again reviewed Thornton's poor attendance with her. (Dep. of Thornton 304, Ex. 9.)[121]  After January 14, 2002, Plaintiff missed

---

court agrees with Defendants that this fact is deemed undisputed for summary judgment purposes. (*See* Doc. #80 at 6.)

[119] Under the policy, an employee receives two points for each absence regardless of the reason for the absence and regardless of whether there is an excuse for the absence. (Dep. of Thornton 298.)

[120] *See* footnote 113, *supra*.

[121] *See id.*

more work.

**b.      The Decision to Deny Thornton the Buyer Position**

Rick Mayo decides which individuals are to be hired as Honda Buyers. (Mayo Aff. ¶¶ 29-46.)[122] However, Plaintiff testified to her belief that Chickerella was in on meetings when Turner discussed the possibility of Thornton becoming a Buyer; she also testified that Turner told her that the possibility of her becoming a Buyer never went past Chickerella.[123] (Dep. of Thornton 256-58.) A few days before she became a full time Honda associate, Thornton met with Mayo, Chickerella, and Jim Small for lunch at the Waffle House. (*Id.* at 99-101.) At that meeting, Chickerella told Thornton that she was going to be hired by Honda as an OSA rather than as a Buyer, but that she would maintain some Buyer functions. (*Id.* at 101, 251, 536.) When Thornton asked Chickerella why she was not being hired as a Buyer, Chickerella responded only "not at this time." (*Id.* at 102.)

However, Thornton never mentioned or reported to anyone in management at Honda or in AR that she believed Chickerella was keeping her from obtaining a Buyer position because she would not date him. (*Id.* at 259.) Instead, Thornton decided to wait and see if she would obtain a Buyer position, even though she had a feeling she would not. (*Id.*) She was nervous that she might lose her OSA job if she reported Chickerella's behavior. (*Id.* at 259-60.)

**c.      Thornton's Alleged Comparators**

Plaintiff believes she was just as qualified to be a Buyer as those individuals who were hired

---

[122] *See id.*

[123] Thornton's citation to the "original tape made by Vick and provided to Defendants . . ." will not herein be considered since any such tape recording is not part of the evidentiary record. (*See* Doc. #80 at 8.)

as Buyers during the time she worked at Honda.[124]  (*Id.* at 271-72, 293, 295.)  Moreover, she claims that she was as qualified as those hired because she had experience working at Honda in the Purchasing Department and had learned the system, and because she had worked in purchasing with a previous employer.  (*Id.* at 316.)  In addition, Thornton believes she was qualified to be a Buyer because she claims she trained the new Buyers as they came to work at Honda:  she showed them the suppliers, phone numbers, and backup suppliers; she introduced suppliers to the Buyers and taught them Turner's expectations for the job.  (*Id.* at 286, 541.)

On June 11, 2001, Mayo made the decision to hire Marcia Morgan as a Honda Buyer. (Mayo Aff. ¶ 33.) Morgan had a college degree from Auburn University's Business Administration curriculum and had been involved on campus in various leadership roles.  (*Id.*)

On December 10, 2001, Mayo made the decision to hire Kari Hampton as a Buyer.  (*Id.* at ¶ 35.)  Hampton was recommended to fill a Buyer position by Tonia Deal Consulting, a placement service that Mayo had previously worked with and that had direct knowledge of the qualifications and abilities needed to perform a Buyer position at Honda.  (*Id.*)  Hampton was recommended because she had twenty years of relevant and meaningful experience in the business of purchasing. (*Id.*)  Prior to her employment at Honda, Hampton worked for a different employer as a senior Buyer, the very same position that Honda hired her for.  (*Id.*)  As a direct result, Hampton was well versed in working with suppliers, and she had already established relationships with suppliers that sold the commodities purchased by Honda.  (*Id.*)  Thus, while Hampton needed only minimal training to work independently, Thornton would have required substantial training and oversight in

---

[124] However, Thornton does admit that she can only compare her qualifications with her perception of how the alleged comparators performed as Buyers while at Honda because she is not familiar with their credentials before arriving at Honda. (Dep. of Thornton at 280.)

purchasing. (*Id.* at ¶ 36.)[125]

Mayo hired Mark Mead as a Honda associate on June 4, 2001. (*Id.* at ¶ 37.) Mead had a college degree in business administration, and had previously worked as a supervisor, manager, and director. (*Id.*) He also had training in several relevant programs, including Materials Requirement Planning, and had obtained an ISO 9000 supplier certification, which enabled him to determine if suppliers were qualified. (*Id.*)

Dawn Watkins was originally hired on March 5, 2001 by Mayo as a Buyer, and at the time of her hire, had an associates degree from Leesburg Community College in Leesburg, Florida. (*Id.* at ¶ 45.) She had also completed three years towards a bachelor's degree in business management at the University of South Florida, and informed Honda that she was still working towards her bachelor's degree and that she planned to continue her studies by attending classes at night after work. (*Id.*) Prior to her employment at Honda, Watkins worked for Metal Industries, Inc. as a supervisor; she was in charge of purchasing steel for five different locations which amounted to approximately $10,000,000 worth of products each month and regularly dealt with hundreds of different suppliers. (Watkins Aff. ¶ 5.)[126]

On December 3, 2001, Mayo made the decision to hire Brent Perkins as a Buyer after Perkins was recommended to him by Tania Deal Consulting. (Mayo Aff. ¶ 39.) Perkins had experience in purchasing, had worked in several states, and had developed relationships with suppliers in those states. (*Id.*) Because of Perkins' experience, he could work independently and responsibly, but Thornton needed more training in purchasing and oversight in order to work as a Buyer. (*Id.* at ¶

---

[125] *See* footnote 113, *supra.*

[126] *See id. See also* Doc. #80 at 6-7.

40.)[127]

Steven Hei began work at Honda as a Buyer on October 15, 2001.  (*Id.* at ¶ 41.)  He had a college degree and had worked in the military as a Warehouse Supervisor and Purchasing Operations and Contracting Officer.  (*Id.*)[128]  In fact, Hei had eighteen years of experience working with the same commodities and systems used by Honda.  (*Id.* at ¶ 42.)  He was accustomed to the purchasing environment in the military, where it was essential that supplies were received by soldiers in the proper time frame and where the consequences of military personnel not receiving supplies could be devastating.  (*Id.*)[129]

Mayo made the decision to hire Chris Morris as a Buyer, and Morris began working for Honda in that position on June 18, 2001.  (*Id.* at ¶ 43.)  Morris had a college degree in Commerce and Business Application, with a major in Management and a minor in Computer Applications and Technology.  (*Id.*)  During college, Morris worked as an intern at Alabama Power purchasing heavy duty equipment; Morris also displayed excellent mechanical understanding and aptitude, which Honda values as important to understanding suppliers' processes and helping them improve their products.  (*Id.*)  Mayo believed that Morris could learn quickly, but that Thornton was progressing slowly during her tenure at Honda.  (*Id.* at ¶ 44.)

###### d.    Thornton's Job Duties and Other Allegations of Retaliation

Plaintiff Thornton claims that Chickerella assigned her unpleasant and unfair job duties after

---

[127] *See id.*

[128] *See id.*

[129] *See id.*

she became a regular full time Honda associate in an effort to force her to resign.[130] (Dep. of Thornton 334-35, 340.) Thornton was required to pass on any Buyer related information to the Buyers hired by Honda, and after she completed that task, her job duties consisted primarily of faxing and filing.[131] (*Id.* at 335-36, 343.) In addition, Thornton was required to clean the computers two or three times a month and pick up trash off of the floor "once in a while."[132] (*Id.* at 337, 341-42.) When a new associate would begin work at Honda, Thornton was required to clean cobwebs out from under the desk and sweep the area, as there was not a janitorial crew working at Honda at that time. (*Id.* at 338.)

Plaintiff alleges that Chickerella humiliated her the day before she resigned. (*Id.* at 112, 344-45.) Chickerella allegedly came up to Thornton behind her desk and said, "Missy, I need to have a word with you" and that he was not going to be "stern" with her, but that he needed to talk to her. (*Id.* at 263, 264.) In a private conference room, Chickerella then told Thornton that some of the male associates were distracted by Thornton putting lipstick on at her desk and that it was rude for her to apply makeup at her desk. (*Id.* at 265-66.) When Thornton asked why Chickerella was having this conversation with her only, he responded that she was the only associate about whom he had heard complaints. (*Id.* at 266-67.) Chickerella did not yell or curse at Thornton, although the Plaintiff does claim that he was rude during the course of the conversation. (*Id.* at 268-69.)

---

[130] Chickerella never asked Thornton to resign. (Dep. of Thornton 340.) Although in her summary judgment opposition, Thornton's counsel has asserted that this fact is disputed, neither Thornton nor anyone else has offered any evidence to create a dispute. Therefore, this fact will be deemed undisputed for summary judgment purposes. (*See* Doc. #80 at 7.)

[131] Plaintiff admits that filing and faxing are tasks appropriate for an OSA and that other OSAs faxed and filed. (*Id.* at 338-41.)

[132] Thornton does not know if anyone else was required to pick up trash on occasion. (*Id.* at 342.)

### e.    Thornton's Resignation

On February 11, 2002, six months after Thornton became a regular Honda associate, she resigned. (*Id.* at 507, 563.)  Thornton e-mailed her resignation to Turner, and later mailed one to Vickie Vaughan. (*Id.* at 262, 329, 331-32, Ex. 12.)  In her letter, Thornton expressed that she had decided to continue her education; in fact, Thornton indicated she was intending on going to cosmetology school. (*Id.* at 320, 331.)  Since leaving Honda, Thornton's goal has been to become a salon owner, and to that end she began studying cosmetology and facial massage at Ayers State Technical College. (*Id.* at 34-35, 329-30.)  Thornton's resignation letter also stated that working at Honda had been a great experience for her and that working with Turner had been a pleasure. (*Id.* at 393-95.)  However, the letter also stated that she had been unhappy working in the OSA position and that she was frustrated about being overlooked for the Buyer positions. (*Id.* at 395.)  Plaintiff claims that she did not include anything about Chickerella in the letter because she wanted to keep open the option of returning to Honda for a job in the future, and she wanted to be able to use Turner as a referral. (*Id.* at 398-99.)

After her resignation, Thornton filed a charge of discrimination with the EEOC on May 22, 2002. (*Id.* at 367-68.)  Plaintiff claims that she did not know that she was supposed to list details in support of her EEOC charge, and that is why she did not include more specific allegations regarding Chickerella's conduct. (*Id.* at 156-57.)

Thornton claims that she had stress, panic attacks, and anxiety after she left her job at Honda. (*Id.* at 12.)  She testified, however, that her anxiety was "slight" prior to the meeting at the Waffle House regarding her future at Honda as a Buyer. (*Id.* at 567.)

IV.     **Applicable Substantive Law and Discussion**

    A.     **Vick's Assault and Battery Claim Against Chickerella**

Under Alabama common law, a plaintiff alleging assault and battery must prove: (1) that the defendant touched the plaintiff; (2) that the defendant intended to touch the plaintiff; and (3) that the touching was conducted in a harmful or offensive manner. *See Harper v. Winston County*, 2004 WL 870456, No. 1021433 (Ala. April 24, 2004) (citing *Ex parte Atmore Comm. Hosp.*, 719 So.2d 1190 (Ala. 1998)). In *Atmore*, the plaintiff presented evidence indicating that the defendant "touched her waist, rubbed against her when passing her in the hall, poked her in the armpits near the breast area, and touched her leg." *Ex parte* Atmore, 719 So.2d at 1194. The plaintiff also presented evidence indicating that "each of these touchings was intentional, was conducted with sexual overtones, and was unwelcome." *Id.* The *Atmore* court held that these factual assertions constituted substantial evidence that the defendant had committed a battery. *Id.*

More often than not, the wrong in an assault and battery claim is not the actual touching, but the manner and spirit in which the touching is done. *Id.* "Thus, to lay hands on another in a hostile manner is a battery, although no damage follows; but to touch another merely to attract his attention is not a battery." *Id.* Actual injury to the body is not a necessary element for an assault and battery claim. *Surrency v. Harbison*, 489 So.2d 1097, 1104 (Ala. 1986.) But where there is conflicting evidence on the occurrence of a battery, the question of whether a battery did occur is for the jury. *Surrency*, 489 So.2d at 1104.

Plaintiff Vick asserts an assault and battery claim against Tom Chickerella. There remain genuine issues of material fact as to whether Chickerella touched Vick and, if he did, his intent in doing so. Plaintiff alleges, and Chickerella denies, that Chickerella often brushed against her

breasts, cupped her breast, massaged her shoulder, pinched her side, and rubbed her leg. Similarly, Plaintiff alleges, and Chickerella denies, that Chickerella intentionally[133] and offensively[134] touched her. Viewing these facts in the light most favorable to the Plaintiff, a reasonable jury could conclude that an assault and battery occurred. Therefore, Defendant Chickerella's Motion for Summary Judgment (Doc. #50) as it relates to Vick's assault and battery claim is due to be denied.

### B.    Invasion of Privacy Claims Against Chickerella

An individual's privacy right is invaded when that individual's private activities have been wrongfully intruded upon such that the intrusion causes outrage or mental suffering, shame or humiliation to a person of ordinary sensibilities. *See Busby v. Truswal Sys. Corp.*, 551 So.2d 322, 323 (Ala. 1989) (citing *Coates v. Taylor*, 428 So.2d 637, 639 (Ala. 1983)). To succeed on a claim alleging sexual harassment invasion of privacy, a plaintiff must show: (1) that the matters intruded into are of a private nature; and (2) that the intrusion would be so offensive or objectionable that a reasonable person subjected to it would experience outrage, mental suffering, shame, or humiliation. *See id.* The "wrongful intrusion" prong is defined as "intentional interference with another's interest in solitude or seclusion, either as to his person or to his private affairs and concerns." *Id.*

The fact that a defendant does not make coercive demands or improper inquiries into sexual proclivities or personality does not automatically justify a grant of summary judgment in favor of

---

[133] Vick presents evidence that Chickerella offensively touched her frequently. From this allegation, the court draws a reasonable inference in favor of the Plaintiff - for purposes of the motion for summary judgment only - that the frequency of the touchings evidences their intentional nature.

[134] In support of the offensive element, Vick asserts that the touchings were made with sexual overtones and that she was afraid of contact every time Chickerella approached her. (Dep. of Vick 175; Vick Aff. ¶ 4.)

the defendant. *See Cunningham v. Dabbs*, 703 So.2d 979, 982 (Ala. 1997.) Rather, inappropriate physical contact and innuendo may lead to a determination of intrusion into personal affairs. *See id.*[135]

### 1.    Vick's Invasion of Privacy Claim Against Chickerella

The question for this court to consider on Vick's invasion of privacy claim is whether there was an offensive or objectionable prying or intrusion into her private affairs or concerns that would have been objectionable to a reasonable person. Disputed evidence was presented from which a reasonable jury could find that Chickerella: (1) continuously sat in a manner to draw attention to his groin area; (2) sat in a manner to draw attention to his groin area when he had an erect penis; (3) told Vick that he would like her to come to work without her shirt on; (4) told Vick he had thought about her coming to work without her shirt on; (5) told Vick she needed a tighter uniform; (6) continuously used profanities in the office;[136] (7) pressured Vick to have drinks with him; (8) pressured Vick to date him; (9) brushed up against Vick's breasts; (10) cupped Vick's breast; (11) massaged Vick's shoulder with his hand; and (12) tugged on Vick's pony tail.

---

[135] The court recognizes that the decisions of the Alabama Supreme Court in cases alleging an invasion of privacy on the grounds of sexual harassment in the workplace are in conflict. The Alabama Supreme Court has found that where an employer made several requests of a female employee to have dinner with him, kiss him, and have an affair with him, such conduct did not rise to the level of invasion of privacy. *See McIssac v. WZEW-FM Corp.*, 495 So.2d 649 (Ala. 1986.) In *McIssac*, the court stated that "even the dire affront of inviting an unwilling woman to illicit intercourse has been held by most courts to be no such outrage" as to constitute invasion of privacy. *Id.* at 652.

[136] This court notes the use of profanity in the workplace, while unseemly and unprofessional, does not necessarily carry with it instances of sexual overtones or sexual innuendo. Therefore, this factor, taken alone, as grounds for an invasion of privacy claim, would fail to defeat a grant of summary judgment.

A jury could reasonably determine from this evidence that Chickerella intruded into Vick's private affairs in an offensive or objectionable manner and thereby invaded her right to privacy. That Chickerella did not make coercive sexual demands on Vick nor make inquiries into her personal sexual proclivities and personality does not lead to an automatic conclusion that Chickerella did not commit the tort of invasion of privacy. *See Cunningham*, 703 So.2d at 982. With *all* of the facts material to Vick's invasion of privacy claim being in dispute, this court declines to decide the extent or frequency of the humiliation and offensive behavior that Vick would be required to endure before she may recover for invasion of privacy. *See id.* Therefore, Chickerella's Motion for Summary Judgment (Doc. #50) as it relates to Vick's invasion of privacy claim is due to be denied.

### 2.    Springfield's Invasion of Privacy Claim Against Chickerella

This court must consider whether Springfield was subjected to an offensive or objectionable prying or intrusion into her private affairs or concerns that would have been objectionable to a reasonable person.  Disputed evidence was presented by Springfield purporting to show that Chickerella invaded her privacy by: (1) brushing up against her breasts four or five times; (2) using profanities; (3) continuously sitting in a manner to draw attention to his groin area; and (4) sitting in a manner to draw attention to his groin area when he had an erect penis.

Taking all of these disputed facts as true, the court nevertheless finds that no reasonable jury could conclude that Chickerella intruded into Springfield's private affairs in an offensive or objectionable manner, nor that Chickerella invaded Springfield's right to privacy.  At the outset, the use of profanity in the workplace carries with it no sexual overtones or sexual innuendo, especially since Chickerella used profanities in the company of both men and women.  Furthermore, the record,

65

as it relates to Springfield, contains scant evidence that Chickerella engaged in the alleged behaviors to intentionally intrude upon the personal affairs of Springfield. Simply stated, these unseemly incidents, without more, fall short of the conduct in *McIssac* that the Alabama Supreme Court held did not rise to the level of an invasion of privacy. *See McIssac*, 495 So. 2d at 652 (holding that the following conduct considered in totality "fall[s] short of that required to constitute this tort:" asking an employee to have an affair, asking the employee out to dinner, asking employee to travel with employer out of state, and putting his arm around her.)

Therefore, Chickerella's Motion for Summary Judgment (Doc. #50) as it relates to Springfield's invasion of privacy claim is due to be granted.

### 3.   Thornton's Invasion of Privacy Claim Against Chickerella

This court considers whether Thornton's private affairs or concerns were offensively or objectionably pried into by Chickerella in a manner that would have been objectionable to a reasonable person. Disputed evidence was presented by Thornton from which a reasonable jury could find that Chickerella: (1) continuously yelled profanities at work; (2) told Thornton she needed tighter pants; (3) whispered in Thornton's ear that she was his favorite girl; (4) constantly told Thornton she was beautiful; (5) constantly told Thornton that he loved the way she dressed because her clothes brought out her body; (6) whispered in Thornton's ear that he liked the way she looked from behind; (7) told Thornton that her buttocks looked good when she ran; (8) leaned into Thornton's chair, put his arm around her back, and rubbed her back; (9) continuously whispered in Thornton's ear; (10) brushed his nose against her hair; (11) touched her upper arm with his thigh numerous times; (12) brushed Thornton's breasts five to seven times; (13) pulled her hair when he passed her desk; (14) sat in a manner to draw attention to his groin area; (15) sat in a manner to draw

attention to his groin area when he had an erect penis; (16) invited Thornton on dates; and (17) called Thornton at her home.

A jury could reasonably determine from this evidence that Chickerella intruded into Thornton's private affairs in an offensive or objectionable manner and thereby invaded her right to privacy. Though sexual concerns are fundamental rights entitled to privacy protection, Chickerella implicitly and explicitly inquired into Thornton's private information, allegedly for the purpose of harassing her. *See Hogin v. Cottingham*, 533 So.2d 525 (Ala. 1988.) And while Chickerella did not make coercive sexual demands, this does not lead to an automatic conclusion that he did not commit the tort of invasion of privacy. *See Cunnigham*, 703 So.2d at 982. Therefore, with *all* of the facts material to Thornton's invasion of privacy claim being in dispute, this court declines to decide the extent or frequency of the offensive behavior that Thornton would be required to endure before she may recover for invasion of privacy. *See id.*

For all of these reasons, Chickerella's Motion for Summary Judgment (Doc. #50) as it relates to Thornton's invasion of privacy claim is due to be denied.

### C.    Honda's Liability for the Intentional Torts of Its Employees

Honda is liable for the intentional torts of Chickerella if: (1) the employee's acts are committed in furtherance of the business of the employer; (2) the employee's acts are within the line and scope of his employment; or (3) the employer participated in, authorized, or ratified the conduct. *See Potts v. BE&K Constr. Co.*, 604 So.2d 398, 400 (Ala. 1992.) Since there is no allegation that the conduct of Chickerella was done in furtherance of Honda's business or in the line and scope of employment, Honda is liable for the conduct of Chickerella only if it participated in, authorized, or ratified Chickerella's conduct. That is, Honda is liable if: (1) Honda had actual knowledge of the

tortious conduct of Chickerella; (2) based on this knowledge, Honda knew the conduct constituted a tort; and (3) Honda failed to take adequate steps to remedy the situation. *Id.* "Adequate" steps are those which are reasonable and necessary to stop the tortious conduct. *Id.* at 401. The Alabama Supreme Court has held that where an employer takes inadequate corrective action by failing to investigate or reprimand the co-employee, that employer may be liable for the intentional torts of an employee. *Mardis v. Robbins Tire & Rubber Co.*, 669 So.2d 885, 889 (Ala. 1995.) In contrast, where the specific tortious conduct stops after corrective action by the employer, the Alabama Supreme Court has held that the corrective action is adequate as a matter of law. *Potts*, 604 So.2d at 401.

### 1. Honda's Liability on Vick's Assault and Battery Claim

To survive summary judgment on her assault and battery claim against Honda, Vick must show that Honda participated in, authorized, or ratified Chickerella's harassing conduct. Vick has produced insufficient evidence to support a claim for liability against Honda. There is a complete lack of evidence in the record that Honda had actual knowledge of the alleged tortious incidents that could have amounted to an assault and battery. While Vick did complain to Turner and Bailey about the shirt comment and the bar outing, she admits that she never complained to anyone at Honda about any other incidents, including the hallway incident, the continuous brushes against her chest, and the pinching incidents. There is no evidence that Honda knew of the conduct that could possibly amount to an assault and battery. Therefore, because Honda had no actual knowledge of the alleged harassment, the company was unable to take adequate steps to remedy the situation. Honda cannot be held accountable for conduct of which it was unaware.

68

Accordingly, the court finds that Honda's Motion for Summary Judgment (Doc. #31) as it relates to Vick's claim for assault and battery is due to be granted.

### 2.    Honda's Liability on Vick's Invasion of Privacy Claim

When all factual disputes and justifiable inferences are resolved in favor of the Plaintiff, the court finds that Plaintiff has adduced evidence sufficient to create questions of fact for a jury on the invasion of privacy claim, including whether Honda knew that the conduct as reported might constitute a tort, whether Honda ratified or condoned Chickerella's conduct, and whether the harassing conduct ceased after Honda's investigation into the complaints of harassment. Accordingly, the court finds that Honda's Motion for Summary Judgment (Doc. #31) as it relates to Vick's invasion of privacy claim is due to be denied.

### 3.    Honda's Liability on Springfield's Invasion of Privacy Claim

Even if Chickerella were not entitled to summary judgment on Springfield's invasion of privacy claim against him, the court finds that Honda would be entitled to summary judgment on this claim. Although there is no dispute in the record that Honda, through Kinsey, had knowledge of the alleged harassment, it is equally undisputed that after Springfield reported the harassment to Kinsey, Springfield suffered no further incidents of sexual harassment. Therefore, whatever corrective conduct Honda undertook was adequate as a matter of law, and Honda cannot be held responsible for Chickerella's alleged tortious conduct.

### 4.    Honda's Liability on Thornton's Invasion of Privacy Claim

To survive summary judgment on her invasion of privacy claim against Honda, Thornton must show that Honda participated in, authorized, or ratified Chickerella's harassing conduct. Thornton has produced insufficient evidence to support Honda's liability. There is a complete lack

of evidence in the record that Honda had actual knowledge of the alleged tortious incidents. In fact, Thornton admits that she never complained to anyone at Honda about Chickerella's conduct, despite the fact that as an associate she was equipped with a copy of the company's harassment policy and at all relevant times knew that harassment was illegal and should be reported to management. Thornton admits that she is not aware that any member of management at Honda observed Chickerella engaging in the alleged conduct. Because Honda had no actual knowledge of the alleged harassment, the company was unable to take adequate steps to remedy the situation. Honda cannot be held accountable for conduct of which it was unaware.

Accordingly, the court finds that Honda's Motion for Summary Judgment (Doc. #30) as it relates to Thornton's claim for invasion of privacy is due to be granted.

### D.    Hostile Work Environment Sexual Harassment

Plaintiffs assert claims of abusive work environment sexual harassment, as that environment was allegedly created by the actions of Chickerella and/or Mayo. Title VII provides that an employer "shall not discriminate against any individual with respect to his terms, conditions, or privileges of employment, because of such individual's race, color, religion, *sex*, or national origin . . . "42 U.S.C. § 2000e-2(a)(1) (1994) (emphasis added.) Title VII has been interpreted to specifically allow claims for sexual harassment to rest upon the theory of an abusive work environment.[137] *See, e.g., Burlington Indust., Inc. v. Ellerth*, 524 U.S. 742, 765 (1998.) A plaintiff

---

[137] The *Ellerth* and *Faragher v. City of Boca Raton*, 524 U.S. 775, 807 (1998), decisions indicate that courts should no longer use the hostile work environment label in analyzing whether an employer should be held liable on a Title VII claim in which no tangible adverse employment decision has been made. In analyzing claims that heretofore would have been labeled "hostile work environment" claims, courts should not ask only whether the conduct complained of "is sufficient to constructively alter an employee's working conditions." *Frederick v. Sprint/United Management Co.*, 246 F.3d 1305, 1311 (11th Cir. 2001.)

attempting to show that she has been subjected to an abusive work environment by a supervisor must prove a number of elements to establish the claim. These elements include proof that: (1) the employee belongs to a protected group; (2) the employee has been subject to unwelcome harassment; (3) the harassment was based on the sex of the employee; (4) the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive work environment; and (5) a basis for holding the employer liable. *See Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1245 (11th Cir. 1999) (en banc.) "Regarding this fifth factor, the Supreme Court held recently that in claims based on a supervisor's harassment, an employer may be vicariously liable for actionable hostile environment discrimination caused by a supervisor with immediate (or successively higher) authority over the employee--subject to an affirmative defense." *Mendoza*, 195 F.3d at 1245 n.4 (*citing Faragher v. City of Boca Raton*, 524 U.S. 775 (1998); *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742 (1998).)

A prima facie showing of a hostile work environment arises only where the sexual harassment is so "severe or pervasive" as to "alter the conditions of employment and create an abusive working environment." *Faragher*, 524 U.S. at 786 (citing *Meritor Sav. Bank v. Vinson*, 477 U.S. 57, 67 (1986).) The Supreme Court's interpretations of the general standard announced in *Meritor* "are sufficiently demanding to ensure that Title VII does not become a 'general civility code.'" *Faragher*, 524 U.S. at 788 (citing *Oncale v. Sundowner Offshore Serv., Inc.*, 523 U.S. 75, 80 (1998).) For example, offhand comments, isolated incidents (unless extremely serious), and other similar tribulations of the workplace will not amount to changes altering the terms and conditions of employment. *See id.* Furthermore, in order to be actionable under the statute, the work environment must be offensive on both an objective and a subjective level. That is, the environment

must be "one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so." *Id.* at 787. This is a question to be determined with regard to the totality of the circumstances. *Henson*, 682 F.2d at 904. Additional factors for courts to consider in the totality analysis include: the frequency of the discriminatory conduct, the severity of the conduct, whether the conduct is physically threatening or humiliating or a mere offensive utterance, and whether the conduct unreasonably interferes with an employee's work performance. *See Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 22 (1993.)

An employer is subject to vicarious liability for the actionable hostile environment created by the victim's supervisor, where that supervisor has the authority to affect the terms and conditions of the plaintiff's employment. *Faragher*, 524 U.S. at 807. Where no adverse employment decision has been made or has resulted, the *Faragher* court allows the employer an affirmative defense. *Id.*; *Pennsylvania State Police v. Suders*, 2004 WL 1300153, at *2 (U.S. June 14, 2004.) The affirmative defense requires the defendant to prove "that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior." *Faragher*, 524 U.S. at 807. The defendant must also prove that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise, *or* the defendant must show that it responded by taking reasonable corrective action after the plaintiff took advantage of the preventive or corrective opportunities provided by defendant. *Id.*

### 1.    Springfield's Hostile Work Environment Claim[138]

Springfield has presented evidence in support of her prima facie case showing that she is a member of a protected class who has been subjected to unwelcome harassment. There is no dispute that Chickerella, as a supervisor with immediate or successively higher authority over Springfield, is accused of the harassing conduct.[139]    However, Springfield has not yet met her burden of establishing a prima facie case of hostile work environment sexual harassment. She must demonstrate to the court that she was harassed because of her sex, female, and that the conduct as alleged was sufficiently severe or pervasive to alter the terms and conditions of her employment.

Chickerella allegedly drew attention to his groin area, brushed against Springfield's breasts four or five times, and constantly used profanities at work. While the use of profanities affected everyone in workplace, both men and women, equally,[140] there remains a dispute as to whether Chickerella brushed up against men and sat in a manner drawing attention to his lap when talking

---

[138] Defendant Honda argues that since Springfield did not complain of a hostile work environment in her EEOC charge, such an action cannot be maintained in federal court. *See* Movant's Submission in Response to Exhibit A of the court's Order (Teresa Springfield) at 40. The purpose of the charge is to put the employer on notice of the allegations and investigation by the Commissioner. Therefore, a Title VII complaint is limited to the scope of the EEOC investigation reasonably expected to grow out of the Plaintiff's EEOC charge. *See Long v. Florida*, 805 F.2d 1542 (11th Cir. 1986.) In the case of Springfield's charge, she alleged sex discrimination and retaliation. She alleged that Chickerella made her feel "uncomfortable" and that she was retaliated against for voicing her complaints. (Dep. of Springfield Ex. 2.) In view of the allegations contained in the charge, this court finds that Springfield's specific allegations of harassment are not beyond the scope of the charge, and as a result will be considered herein.

[139] At Honda, Springfield worked as an OSA in the Parts Maturation Area, which is a division of Honda's PORD division, and reported to Kevin Kinsey, Team Manager Purchasing/Parts Maturation. (*Id.* at 91, 94, 105, 137.) Kinsey reported directly to Tom Chickerella. (Kinsey Aff. ¶ 4.)

[140] Except for the use of two specific profanities that are arguably more offensive to women than men, the use of profanities affected everyone in the workplace equally.

73

to men.  According to Springfield, these incidents affected only women; however, Chickerella denies the occurrence of these incidents altogether.  Therefore, for summary judgment purposes the court will assume that Chickerella did not brush up against men nor sit in a manner drawing attention to his lap when talking to male employees.

Nevertheless, when all factual disputes and justifiable inferences are resolved in favor of the Plaintiff, the court finds that Plaintiff Springfield has failed to adduce sufficient evidence that the conduct as alleged was so severe or pervasive such that it affected the terms and conditions of her employment.  Whether the sexual harassment to which Springfield was exposed was sufficiently severe or pervasive is a question to be determined with regard to the totality of the circumstances. "Relatively isolated" instances of non-severe misconduct will not support a hostile work environment claim.  *See Saxton v. Am Telephone & Telegraph Co.*, 10 F.3d 526, 533 (11th Cir. 1993.)  Therefore, when considering whether Chickerella's conduct meets the severe or pervasive threshold, this court considers the frequency of the conduct, its severity, whether the behavior is physically threatening or humiliating, and if the conduct interferes with the employee's abilities to perform her duties.  *See Mendoza*, 195 F.3d at 1246.  In *Mendoza*, the court concluded that the following conduct, considered in its totality, fell "well short of the level of either severe or pervasive conduct sufficient to alter terms or conditions of employment:" (1) telling the plaintiff he was "getting fired up;" (2) rubbing his hip against the plaintiff's while touching her shoulder and smiling; (3) making sniffing sounds while staring at the plaintiff's groin; and (4) constantly following and staring at the plaintiff.  *Id.* at 1247-48.  The *Mendoza* court stressed that the plaintiff in that case presented no evidence that the harasser's conduct was physically threatening or humiliating nor did she show that the cumulative effect of the conduct interfered with her job

74

performance. *Id.* at 1248.

In light of *Mendoza*, the conduct in Springfield's case does not rise to the level of being severe or pervasive such that it altered the terms and conditions of Springfield's employment. While Chickerella's alleged conduct is unseemly, unprofessional, and boorish, it simply does not rise to the level of severe or pervasive. Instead, the incidents as alleged are relatively isolated. Further, other than as related to her retaliation claim, Plaintiff has presented no evidence suggesting that the harassing conduct altered the terms and conditions of her employment. In fact, Springfield testified that she did not want to report the conduct until she was a regular, full time associate at Honda because she enjoyed her time at Honda and loved her job. (Dep. of Springfield 138-40, 287-88.)

Therefore, when all factual disputes and justifiable inferences are resolved in favor of Plaintiff Springfield, the court finds that Plaintiff has failed to adduce sufficient evidence on her Title VII claim to create questions of fact for the jury.[141] Accordingly, the court finds that Honda's

---

[141] Even if Springfield had produced sufficient evidence to support a finding that the conduct as alleged was severe or pervasive, Defendant Honda could not be held liable for the alleged harassment. The tangible employment action theory of liability is inapplicable to Springfield's sexual harassment claim because the law requires that the adverse employment action must be taken or threatened by a harassing supervisor. *See Ellerth*, 524 U.S. at 760-61. While Springfield claims that Honda rescinded her conditional offer of full time employment because she complained of sexual harassment, the record contains no evidence that Chickerella made the final decision to not hire Springfield, nor that any discriminatory intent attributable to him motivated the final decision-maker. Furthermore, there is no causal link between the tangible employment action and the protected conduct, as Springfield was offered a conditional offer of employment *two weeks after* she complained of Chickerella's harassing conduct.

Further, even if it could be said that there is a genuine dispute in the record as to whether Honda exercised reasonable care to prevent the harassing behavior in the workplace and whether Springfield unreasonably failed to take advantage of any preventive or corrective opportunities provided by Honda to avoid the harm, there is no dispute that Honda corrected promptly the harassing behavior. After Springfield complained to Kinsey about Chickerella's conduct, the harassment stopped. (Dep. of Springfield 197-98.) Regardless of whether Springfield should have been told to make a formal complaint of harassment through company procedure, Springfield's complaint to Kinsey was effective in that it prevented Chickerella from continuing to sexually harass

Motion for Summary Judgment (Doc. #32) as it relates to Springfield's claim of hostile work environment under Title VII is due to be granted.

### 2.    Tiedemann's Hostile Work Environment Claim

Tiedemann claims that Mayo and Chickerella created a hostile work environment at Honda which adversely affected the terms and conditions of her employment. Tiedemann is a member of a protected class,[142] and while there is some question as to whether Plaintiff was subjected to unwelcome harassment, the court, stating the facts in the light most favorable to the Plaintiff, finds for purposes of the instant motion that some form of offensive conduct occurred. However, Tiedemann has not met her burden of producing a prima facie case of abusive work environment sexual harassment.

Tiedemann must show to the court that she was harassed because of her sex and that the harassment rose to the level of being severe or pervasive; the Plaintiff has simply failed to show that the complained of conduct meets these necessary elements. First, Tiedemann has made virtually no showing that but for her sex, female, she would not have been the object of harassment. *See Henson,*

---

Springfield.

[142] The court gives Tiedemann the benefit of the doubt on this point. Repeatedly in both her deposition and affidavit, Tiedemann asserts that she is suing Honda because she believes that Mayo and Chickerella harassed her because she was not thin and blonde, as allegedly were the other women at Honda. (Dep. of Tiedemann 153, 182, 215-16; Tiedemann Aff. ¶ 4.) Hair color and weight are not characteristics protected under Title VII. *See* 42 U.S.C. § 2000e-2. Furthermore, Tiedemann does not allege that Honda applied a different standard to male employees than it did to female employees when it came to height and hair color. (Dep. of Tiedemann 314, 318.) Tiedemann alleges only that other females were treated better because of their weight and hair color. (*Id.* at 313-14.) Therefore, Plaintiff's claim as articulated in her sworn testimony does not state a claim under Title VII. However, since Tiedemann's Amended Complaint (Doc. #13) states a claim for gender harassment, the court will proceed on the notion that Tiedemann is suing Honda for gender harassment, a protected characteristic under Title VII.

682 F.2d at 904.  In support of her hostile work environment claim, Tiedemann alleges the continuous use of nicknames and curse words around her, yet she readily admits that nicknames and curse words were used in front of everyone, both men and women.  (Mayo Aff. ¶ 11; Dep. of Tiedemann 183, 185-87.)  To support her hostile work environment claim, Tiedemann also alleges that Mayo joked more with other men and women than he did with her.  (Dep. of Tiedemann 303-04, 367.)  Because even Tiedemann's testimony shows that the alleged conduct affected both men and women, Plaintiff's prima facie case of gender harassment fails.

Even if Tiedemann could show that she was harassed because of her gender,[143] she nevertheless fails to state a prima facie case of gender harassment for a different reason – the conduct she has alleged does not rise to the level of being severe or pervasive such that it altered her terms and conditions of employment.  Tiedemann alleges that Chickerella and Mayo harassed her by: (1) not paying her enough attention; (2) calling her nicknames and cursing in her presence; and (3) commenting about "thin blonde" women.  While the totality of this conduct as alleged is unprofessional, finding it violative of Title VII would, contrary to the Supreme Court's injunction, turn that statute into a general civility code, guarding against "the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing."  *See Faragher*, 524 U.S. at 788 (internal citations omitted.)  Taken as a whole, Mayo and Chickerella's use of profanities were not directed at Tiedemann nor at women in general.

---

[143] Plaintiff argues that while it is true that both men and women were subjected to similar conduct, the effect of the conduct was not the same on men as women in general, and Plaintiff in particular.  Plaintiff argues that the nickname "Tatertot" was offensive because women in general are pained and humiliated when they are referred to as being overweight. (*See* Pls.' Brief in Opp'n. to Defs.' Motions for Summ. J. at 7-8.)  Neither life, logic, nor the law support Tiedemann's argument.

Furthermore, the only evidence before the court shows that the use of a nickname to refer to Tiedemann was done in a non-sexual and non-abusive manner, the same manner in which Mayo called his other employees by nicknames.  Innocuous statements that bear no relation to gender cannot be characterized as creating an "atmosphere charged with hostility." *E.E.O.C. v. Beverage Canners, Inc.*, 897 F.2d 1067, 1068 (11th Cir. 1990.)  Thus, taking as true all of the conduct allegedly undertaken by Mayo and Chickerella during Tiedemann's employment, the court concludes that the conduct described by Tiedemann was unprofessional, but not so severe, threatening, or disruptive as to rise to the egregious level required to create an actionably hostile work environment.[144]  In other words, her allegations fall below the *Mendoza* line. *Mendoza*, 195

---

[144] Alternatively, even if the incidents in Tiedemann's case could be deemed sufficiently severe or pervasive to constitute a hostile work environment, Tiedemann's Title VII claim of hostile work environment cannot survive summary judgment.

Plaintiff does not allege that she suffered a tangible employment action as a result of the alleged harassment.  The only adverse action that Tiedemann claims to have been subjected to is the discontinuation of her temporary assignment at Honda, which forms the basis of her retaliation claim rather than her harassment claim. (Dep. of Tiedemann 273-75.)  For a discussion on Plaintiff's failure to establish a causal connection between the harassment and the adverse act, see this court's analysis under Tiedemann's Retaliation Claim, *infra* section IV.E.2.

Therefore, where no tangible employment action is taken, an employer may assert an affirmative defense to a hostile work environment claim by showing that: (1) it exercised reasonable care to prevent and correct promptly any sexually harassing behavior; and (2) the plaintiff unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer to avoid harm otherwise. Tiedemann never reported to anyone at Honda that she believed she was bring discriminated against because of her gender, though she did understand that if she believed she was being discriminated against, she should report that discrimination to upper management or associate relations at Honda. Plaintiff's conversation with Vickie Vaughan focused primarily on her desire to become a full time Honda associate. While Tiedemann did mention her perception that Mayo and Chickerella had a preference for thin blonde employees, the next day she told Vaughan that she did not want to pursue this latter allegation. Plaintiff never voiced an opinion that male employees were treated more favorably than female employees at Honda. Therefore, Honda cannot be said to have acted unreasonably in failing to correct any alleged gender harassment because the company was not apprized of gender harassment. *See Reynolds*, 106 F.Supp.2d at 1252-53 (stating that the court need only consider the adequacy of the employer's response if it is determined that the employer had sufficient notice of the offending conduct.)

F.3d at 1247-48.

Therefore, when all factual disputes and justifiable inferences are resolved in favor of Tiedemann, the court finds that the Plaintiff has failed to adduce sufficient evidence on her Title VII claim to create questions of fact for the jury. Accordingly, the court finds that Honda's Motion for Summary Judgment (Doc. #33) as it relates to Tiedemann's claim of hostile work environment under Title VII is due to be granted.

### 3.    Thornton's Hostile Work Environment Claim

Plaintiff Thornton claims that Chickerella's sexually harassing conduct had the effect of creating a hostile work environment at Honda. She claims that the cumulative effect of the alleged incidents of improper conduct rose to the level of being so severe or pervasive as to "alter the conditions of employment and create an abusive working environment." *Faragher*, 524 U.S. at 786 (internal citations omitted.) To address Thornton's claim, the court need not analyze its merits for the reasons stated below.

Title VII requires that a plaintiff file a charge with the EEOC alleging that her employer engaged in an unlawful employment practice prior to bringing a civil action alleging a violation of Title VII. *See* 42 U.S.C. § 2000e-5. It is settled law that in order to obtain judicial consideration of such a claim, a plaintiff must first file that charge with the EEOC within 180 days after the alleged unlawful employment practice occurred. *See Pijnenburg v. West Georgia Health Sys., Inc.*, 255 F.3d 1304, 1305 (11th Cir. 2001.)

A hostile work environment claim is composed of a series of separate acts that collectively constitute one unlawful employment practice. *See Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 117 (2002.) As related to a hostile work environment claim, the timely filing provision requires

at least one act contributing to the claim to fall within the filing period; it does not matter that some of the component acts of the hostile environment fall outside the statutory time period, as long as one act relating to the claim falls within the 180 day filing period. *See id.*

Thornton did not file a charge with the EEOC until May 22, 2002. (Dep. of Thornton Ex. 13.) She testifies in the course of her deposition that all of the alleged harassment relating to her hostile work environment claim stopped approximately two weeks before she became a full time Honda associate on August 6, 2001, or around July 23, 2001. (Dep. of Thornton 131-34, 419.) Under this time line, Thornton should have filed a charge with the EEOC within 180 days of the last act relating to her hostile work environment claim; that is, Thornton had until January 19, 2002 to file a claim of hostile work environment sexual harassment with the EEOC. Thornton failed to file her claim by that date, and instead filed her claim on May 22, 2002. Therefore, because none of the harassing acts occurred within the 180 day period for filing a charge, the acts related to the hostile work environment claim are not actionable.

Therefore, Defendant Honda's Motion for Summary Judgment (Doc. #30) as it relates to Thornton's hostile work environment claim is due to be granted.

### E.    Retaliation

Retaliation is a separate violation under Title VII, and to recover under such a claim, a plaintiff "'need not prove the underlying claim of discrimination which led to her protest,' so long as she had a reasonable good faith belief that the discrimination existed." *Gupta v. Florida Bd. of Regents*, 212 F.3d 571, 586 (11th Cir. 2000) (citing *Meeks v. Computer Assocs. Int'l.*, 15 F.3d 1013, 1021 (11th Cir. 1994) (quoting *Tipton v. Canadian Imperial Bank of Commerce*, 872 F.2d 1491, 1494 (11th Cir. 1989))). Thus even where a plaintiff has failed to make a prima facie showing of

discrimination (or present sufficient evidence of discriminatory treatment), she may still have a valid claim for retaliation.

In order to establish a prima facie case of retaliation, a plaintiff must prove the following elements: (1) she participated in an activity protected by Title VII; (2) she suffered an adverse employment action; and (3) there is a causal connection between the participation in the protected activity and the adverse employment decision. *See Farley v. Nationwide Mut. Ins.*, 197 F.3d 1322, 1336 (11th Cir. 1999.) To establish a causal connection, a plaintiff must show that the decision-maker was aware of the protected conduct and that the protected activity and the adverse action were not wholly unrelated. *See id.* at 1377. The causal link element is generally construed broadly so that "a plaintiff merely has to prove that the protected activity and the negative employment action are not completely unrelated." *Olmstead v. Taco Bell Corp.*, 141 F.3d 1457, 1460 (11th Cir. 1998.) Thus, a "close temporal proximity" between the plaintiff's protected conduct and an adverse employment action generally is sufficient circumstantial evidence of a causal connection for purposes of a prima facie case. *See id.* On the other hand, the Eleventh Circuit has indicated that a substantial delay between the protected activity and the adverse employment action and the absence of other evidence tending to show causation may justify judgment as a matter of law for the employer. *See Wascura v. City of South Miami*, 257 F.3d 1238, 1248 (11th Cir. 2001); *Maniccia v. Brown*, 171 F.3d 1364, 1370 (11th Cir. 1999.) Moreover, the Supreme Court warned that "mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action . . . must be 'very close.'" *Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001) (citations omitted.)

81

Once the plaintiff has made a prima facie case of retaliation, the defendant must come forward with a legitimate, non-discriminatory reason for the adverse employment decision. *See St. Mary's Honor Cntr. v. Hicks*, 509 U.S. 502, 507 (1993.) Because a plaintiff bears the burden of proving pretext, once defendant has articulated a legitimate, non-discriminatory reason for the termination, plaintiff must present significantly probative evidence proving pretext to avoid summary judgment. *See Celotex*, 477 U.S. at 317. The plaintiff must establish evidence from which a reasonable trier of fact would disbelieve rather than disagree with defendant's articulated legitimate, non-discriminatory reason for the adverse employment action. *See Combs v. Plantation Patterns*, 106 F.3d 1519, 1543 (11th Cir. 1997.)

### 1.    Springfield's Retaliation Claim

Stating the facts as most favorable to the Plaintiff, Springfield engaged in an activity protected by Title VII when she complained about sexual harassment.[145] It is undisputed that she suffered from an adverse employment decision, in that she was not hired as a full time associate at Honda. *See* Movant's Submission in Response to Exhibit A of the court's Order (Teresa Springfield) at 55. Therefore, the remaining issue for this court to consider on the prima facie case is whether Plaintiff can establish that the adverse action was causally related to the protected activity.

---

[145] Springfield complained about sexual harassment to her supervisor, Kinsey. To qualify as statutorily protected conduct, Plaintiff must have reasonably believed that the actions about which she was complaining constituted unlawful harassment. *Breeden*, 532 U.S. at 268. Considering the evidence most favorably to Springfield, she could have reasonably believed, subjectively and objectively, that Chickerella's conduct constituted unlawful harassment. Further, the fact that Kinsey allegedly spoke to Chickerella about the conduct complained of evidences that certain persons at Honda was on notice that Springfield was making a complaint. *See Reynolds v. Golden Corral Corp.*, 106 F.Supp.2d 1243 (M.D. Ala. 1999.)

Springfield has not demonstrated a sufficient nexus between her protected activity and the adverse action she suffered. First, the time line of events indicates that Plaintiff's complaints of sexual harassment were not causally linked to the decision to rescind her conditional offer. Plaintiff reported Chickerella's conduct to Kinsey in October 2001. (Dep. of Springfield 192-94.) In November 2001, *a mere two weeks later*, Honda extended to Plaintiff an offer of full time employment conditioned on her completion of a medical examination. (Dep. of Springfield 278.) *Then* Plaintiff allegedly submitted false information on her medical questionnaire, resulting in the withdrawal of her conditional offer of employment. (Springfield Aff. ¶ 14.) The fact that a positive action – making Springfield a conditional offer of employment – intervened between her complaint of harassment and Honda's decision to withdraw her offer evidences that Springfield's report of harassment was wholly unrelated to her failure to receive permanent employment at Honda. Second, on November 20, 2001, when Bailey made the decision to rescind the conditional offer, she was equipped with *only* two seemingly inconsistent pieces of information: (1) Plaintiff's answers to the medical questionnaire that she had never experienced fainting spells; and (2) doctors' notes stating that Plaintiff was complaining of "spells she has had, really for several years, 'blackout' spells."[146] (Dep. of Springfield Ex. 6.) Although Bailey received a letter from Dr. Kemph in late December 2001, suggesting that Springfield had answered the medical questionnaire truthfully, this evidence was not before Bailey when the decision to rescind was made. Therefore, Springfield cannot rely on Dr. Kemph's letter to establish a causal connection between her complaints and the decision at issue.

---

[146] The doctors' notes in the record state several times that Plaintiff was reporting symptoms associated with fainting spells: "light headedness, dizziness, chest pain, not sure if she passed out;" "syncope;" "patient called stating having blackouts." (Dep. of Springfield Exs. 6-11.)

Furthermore, the Plaintiff has come forward with no evidence showing that the "decision-maker [was] aware of the protected activity." *Gupta*, 212 F.3d at 590.

> In order to show the two things were not entirely unrelated, the plaintiff must generally show that the decision maker was aware of the protected conduct at the time of the adverse employment action. *See Goldsmith v. City of Atmore*, 996 F.2d 1155, 1163 (11th Cir. 1993); *Raney v. Vinson Guard Serv., Inc.,* 120 F.3d 1192, 1197 (11th Cir. 1997) ("[I]n a case involving a corporate defendant the plaintiff must show that the corporate agent who took the adverse action was aware of the plaintiff's protected expression....") That requirement rests upon common sense. A decision maker cannot have been motivated to retaliate by something unknown to him.

*Brungart v. BellSouth Telecommunications, Inc.*, 231 F.3d 791, 799 (11th Cir. 2000.) Although the evidence is clear that Bailey made the decision to rescind the conditional offer of employment, Plaintiff adduces no evidence contesting Honda's assertion that Bailey was unaware of Springfield's protected activity at the time the adverse decision was made. (*See* Bailey Aff. ¶ 44; *see generally* Springfield Aff.) Therefore, for summary judgment purposes, Bailey's ignorance of Springfield's complaints is undisputed. For this separate reason, Springfield's prima facie case of retaliation fails.

Even if Springfield had produced a prima facie case of retaliation, Honda has articulated falsification of medical records as the legitimate, non-discriminatory reason for the failure to hire Springfield as a full time associate,[147] and Springfield has failed to come forward with probative evidence that Honda's articulated reason was pretext for discrimination. Plaintiff and her doctors simply disagree with the decision not to hire her – they contend that blackouts and fainting are not the same as periods of unresponsiveness. While the Plaintiff may view the medical conditions to be different, Honda came to the conclusion that Springfield purposefully falsified information during

---

[147] The Eleventh Circuit has recognized that the falsification of information on an employment application is a legitimate, non-discriminatory reason for terminating an employee. *See Morgan v. City of Jasper*, 959 F.2d 1542, 1548 (11th Cir. 1992.)

the medical review. Plaintiff has offered no evidence to establish that Bailey's decision to withdraw the permanent offer of employment was based on anything other than apparent inconsistencies between medical doctors' notes and Plaintiff's responses to questions during the medical review. This court refuses to sit as a super-personnel board, second-guessing Honda's decision to withdraw Springfield's offer of permanent employment on an apparent falsification of medical records. *Chapman*, 229 F.3d at 1030; *Combs*, 106 F.3d at 1543.

For all of these reasons, Honda's Motion for Summary Judgment (Doc. #32) as it relates to Springfield's retaliation claim is due to be granted.

### 2.    Tiedemann's Retaliation Claim

Stating the facts in the light most favorable to her, Tiedemann engaged in an activity protected by Title VII when she complained about sexual harassment.[148] *See Gupta*, 212 F.3d at 587. It is undisputed that she suffered from an adverse employment decision, in that she was discharged from temporary employment at Honda and was not hired as a regular full time associate. (*See* Movant's Submission in Response to Exhibit A of the court's Order (Tiedemann) at 49.) Therefore, the remaining issue for this court to consider is whether Plaintiff can establish that the adverse action was causally related to the protected activity.

---

[148] It is indeed most favorable to Tiedemann to state that she complained that she was being treated differently than her co-workers to Vaughan. This court is aware that to qualify as statutorily protected conduct, the plaintiff must have reasonably believed that the actions about which she was complaining constituted unlawful harassment. *Breeden*, 532 U.S. at 268. For the sake of argument, the court will assume that Tiedemann reasonably believed, subjectively and objectively, that Mayo and Chickerella's conduct constituted unlawful harassment, though the court, as stated earlier, finds that the conduct was not so severe or pervasive such that it altered Tiedemann's terms and conditions of employment.

To prove the causal connection, Tiedemann must show that the complained of actions were motivated by an intent to retaliate against her for engaging in a protected activity and that her protected activity and the adverse action were not "wholly unrelated." *Morgan*, 959 F.2d at 1547. While Mayo made the decision to terminate Tiedemann's employment at Honda, Plaintiff nevertheless is unable to show that this decision was not "wholly unrelated" to her complaints of harassment to Vaughan. Any report that Tiedemann made of Mayo and Chickerella's conduct was undisputedly made in late November 2001. (Dep. of Tiedemann 259; Vaughan Aff. ¶ 5, Ex. 1.) Tiedemann was discharged from temporary employment at Honda in late March 2002. (Dep. of Tiedemann 21.) This more than four month time lag between the allegedly protected activity and adverse employment decision is insufficient to establish the causal link necessary to show that the adverse decision was not wholly unrelated to the protected activity.[149]

Even if Tiedemann had come forward with enough evidence to support a prima facie case of retaliation, she still could not defeat summary judgment. Honda has offered undisputed legitimate, non-retaliatory reasons for ending Tiedemann's temporary assignment and not hiring her as a full time associate, and Tiedemann has failed to come forward with any probative evidence indicating that Honda's proffered reasons for the adverse employment decision were pretextual. The Eleventh Circuit has specifically recognized that poor attendance and work performance are legitimate, non-discriminatory reasons for terminating a Plaintiff's employment. *See Damon*, 196

---

[149] As noted earlier, the Eleventh Circuit has indicated that a substantial delay between the protected activity and the adverse employment action and the absence of other evidence tending to show causation may justify judgment as a matter of law for the employer. *See Wascura*, 257 F.3d at 1248. The Supreme Court has cited with approval cases holding that a three to four month disparity between the protected activity and the adverse decision insufficient to establish the causal link. *See Breeden*, 532 U.S. at 273.

F.3d at 1361. Tiedemann admits that she had poor attendance while a temporary Honda employee

and admits that she was counseled by Mayo on the issue of her attendance. (Dep. of Tiedemann

118.) Further, Tiedemann admits that on numerous occasions Mayo was unhappy with her work

product and that he discussed her work problems with her on several occasions. (*Id.* at 166-78, 257-

58.) An employee who admits to failing to meet her employer's expectations usually negates any

inference of discrimination, and an employee who cannot knock down all of the employer's

proffered reasons cannot avoid summary judgment. *Lilly v. Flagstar Enter., Inc.*, 2001 WL 849537

(M.D. Ala. Jul 26, 2001) (NO. CIV. A. 00-D-1313-E) (*citing Chapman*, 229 F.3d at 1037); *see also*

*Combs*, 106 F.3d at 1543.

Plaintiff fails to offer any evidence indicating that Honda's proffered legitimate, non-

discriminatory reasons for the adverse employment action were pretextual. Plaintiff simply states

that the adverse employment action "occurred very shortly" after she voiced her complaints. (*See*

Pls.' Brief in Opp'n. to Defs.' Motions for Summ J. at 8.) As the court has already found, there is

no causal connection between the allegedly protected activity and the adverse employment decision.

For all of these reasons, Honda's Motion for Summary Judgment (Doc. #33) as it relates to

Tiedemann's retaliation claim is due to be granted.[150]

### 3.    Thornton's Retaliation Claim

Before litigating a claim, Title VII requires that a plaintiff file a charge with the EEOC

alleging that her employer engaged in an unlawful employment practice. *See* 42 U.S.C. § 2000e-5.

---

[150] Because the court has considered the merits of Tiedemann's claims and determined that
Honda's Motion for Summary Judgment is due to be granted as to each of those claims, the court
need not consider whether Tiedemann is also due to be judicially estopped from asserting her claims
because she failed to disclose them in her bankruptcy proceedings.

It is settled law that in order to obtain judicial consideration of such a claim, a plaintiff must first file that charge with the EEOC within 180 days after the alleged unlawful employment practice occurred. *See* 42 U.S.C. § 2000e-5(e)(1); *see also Pijnenburg*, 255 F.3d at 1305. A discrete retaliatory or discriminatory act "occurred" on the day it "happened." *Morgan*, 536 U.S. at 110. Therefore, a plaintiff alleging a discrete act of retaliation must file a charge with the EEOC within 180 days of the occurrence of the discrete act. Further, discrete acts that fall within the statutory time period do not make timely acts that fall outside the time period. *United Air Lines, Inc. v. Evans*, 431 U.S. 553 (1977.) Each discriminatory acts starts a new clock for filing charges alleging that act. *See Morgan*, 536 U.S. at 113.

Thornton alleges that she was passed over several times for the position of Buyer at Honda. More specifically, Thornton alleges that she should have been hired instead of her comparators on or about: June 11, 2001; December 10, 2001; June 4, 2001; March 5, 2001; December 3, 2001; October 15, 2001; and June 18, 2001. Thornton had 180 days from each of these discrete acts of retaliation/failure to promote within which to file her charge with the EEOC. Regardless of which of these dates is examined, Thornton's charge filed on March 22, 2002 is untimely as it relates to each discrete act.[151]

---

[151] Although Plaintiff's deposition testimony that Chickerella forced her to resign by assigning her unpleasant and unfair job duties and humiliating her may suggest that a claim for constructive discharge lurks within her retaliation claim (*see* Dep. of Thornton 334-35, 340), such a claim was not properly pled in the complaint nor argued by the Plaintiff in her summary judgment brief. Nonetheless, the court finds that, to the extent such a claim is in the case, summary judgment is due to be granted. While it is true that a constructive discharge claim would not be time-barred because Thornton's May 22, 2002 EEOC charge filing was within 180 days of her February 11, 2002 resignation, Thornton could not prevail on such a claim for other reasons. A constructive discharge occurs when a discriminatory employer imposes working conditions that are "so intolerable that a reasonable person in [the employee's] position would have been compelled to resign." *Fitz v. Pugmire Lincoln-Mercury, Inc.*, 348 F.3d 974, 977 (11th Cir. 2003) (quoting *Poole*

For this reason, Honda's Motion for Summary Judgment (Doc. #30) as it relates to Thornton's retaliation claim is due to be granted.

Alternatively, even if Thornton had filed a timely charge with the EEOC, she could not avoid summary judgment because she has not brought forth evidence sufficient to adduce a prima facie case of retaliation. At the outset, Thornton made no complaint to anyone in management at Honda that she was being harassed by Chickerella. While she did file a charge of discrimination with the EEOC, that charge was filed *after* the alleged retaliation, and so necessarily cannot be a basis of her retaliation claim. Therefore, the only basis for Plaintiff's claim that she engaged in statutorily

---

*v. Country Club of Columbus, Inc.*, 129 F.3d 551, 553 (11th Cir. 1997).) In fact, the standard for proving constructive discharge is higher than the standard for proving hostile environment. *Hipp v. Liberty Nat'l Life Ins.*, 252 F.3d 1208, 1231 (11th Cir. 2001.) Therefore, the question on summary judgment becomes: could a reasonable juror conclude that the working conditions endured by Thornton were so intolerable as to compel a reasonable person to resign?

Viewing the facts in the light most favorable to Thornton, this court would be unable to conclude that a jury might find that the evidence in this case "paints a picture of intolerable working conditions such that a reasonable person would have felt compelled to resign." *See Fitz*, 348 F.3d at 979 (quoting *Durley v. APAC, Inc.*, 236 F.3d 651, 658 (11th Cir. 2000)). In support of her "lurking" claim of constructive discharge, Thornton offers evidence that she was required to: (1) train the Honda Buyers; (2) perform the clerical duties of faxing and filing; (3) clean the computers two or three times a month; (4) pick up trash off the floor once in a while; and (5) clean cobwebs from under a desk and sweep the area before new associates arrived. She also offers evidence that she was humiliated by Chickerella when he told her not to apply her make-up at her desk. Of course, the allegations of failure to promote relate to any constructive discharge claim as well. It is for the combination of these reasons that Thornton believes she was constructively discharged, although her letter of resignation states that she desired to study cosmetology and felt that she should go to school in support of that goal since she had been "overlooked" for the Buyer position.

These facts simply do not rise to the level of intolerable working conditions. Training new employees and performing filing and faxing tasks are clerical duties of OSAs at Honda. This is the capacity in which Thornton was hired to work. Infrequent, light, general office cleaning is not so intolerable that it would force a reasonable person to resign from their position. Further, that Thornton's letter of resignation did not cite these cleaning incidents as part of the reason for her resignation indicates that she did not consider these to be "intolerable working conditions." *See Graham v. State Farm Mut. Ins. Co.*, 193 F.3d 1274, 1284 (11th Cir. 1999) (stating that "Plaintiff's letter of resignation, in which she expressly thanks State Farm, does not by its terms lend support to a theory that Plaintiff was forced to resign due to 'intolerable working conditions'".)

protected conduct must be that she refused Chickerella's sexual advances. However, recent district court decisions have held that "even the broadest interpretation of a retaliation claim cannot encompass instances where the alleged 'protected activity' consists simply of declining a harasser's sexual advances . . . If it were otherwise, every harassment claim would automatically state a retaliation claim as well." *Del Castillo v. Pathmark Stores, Inc.*, 941 F.Supp. 437, 438 (S.D. N.Y. 1996.) In any event, as there is no Eleventh Circuit law on this point, this court will proceed with an analysis of the prima facie case assuming, *arguendo*, that Thornton engaged in statutorily protected conduct when she "complained" of what she reasonably believed to be sexual harassment. *See Breeden*, 532 U.S. at 268.

There is no dispute that Thornton suffered the adverse employment action of being denied a promotion to the position of Buyer. Therefore, the remaining question for this court to consider on the issue of Thornton's retaliation claim is whether or not Thornton's failure to obtain the Buyer position was causally related to her denial of Chickerella's sexual advances. This is an issue which is wracked by factual dispute. Turner states that Chickerella was not "in" on the discussions relating to whether Thornton would be promoted to the position of Buyer, but Chickerella allegedly told Thornton that he was "the one who could place personnel in [buyer] positions." (Amend. Compl. ¶ 48.) Thus, in viewing the facts in the light most favorable to Thornton, while it is undisputed that Mayo made the final decisions relating to Buyer positions, it is possible that Chickerella had input into those decisions and that Chickerella's discriminatory intent affected the decision not to promote Thornton to the position of Buyer.

Regardless of this factual dispute, Thornton fails to adduce facts sufficient to prevent a grant of summary judgment in favor of Honda on the issue of retaliation. Assuming, again *arguendo*, that

Thornton has met the burden of establishing a prima facie case, the burden shifts to Honda to articulate a legitimate, non-discriminatory reason for the failure to promote Thornton. Honda articulates[152] that Mayo, as final decision-maker, decided that Thornton was not qualified for the position of Buyer. Since this is a legitimate, non-discriminatory reason for a failure to promote, the burden shifts back to Thornton to show that disparities in qualifications were really a pretext for discrimination.

While Thornton did have some experience in the Purchasing Department of Honda and "trained" the new Buyers as they came to work, she did not have either the education or experience possessed by those actually hired as Buyers. Several of the Buyers hired by Honda possessed college degrees or were taking college level courses. Where the new Buyers did not possess college degrees, they had years of relevant and meaningful experience in the business of purchasing and/or had developing relationships with suppliers that Honda also did business with. Thus, while Thornton believes she was just as qualified to be a Buyer as those individuals who were actually hired as Buyers during the time she worked at Honda,[153] she has produced no evidence such that her

---

[152] The burden of Honda at this stage of the analysis is not to "persuade the court that it was actually motivated by the proffered reasons. It is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff .... To satisfy the intermediate burden, the employer need only produce admissible evidence which would allow the trier of fact rationally to conclude that the employment decision had not been motivated by discriminatory animus." *Burdine*, 450 U.S. at 254-55.

[153] "The inquiry into pretext centers upon the employer's beliefs, and not the employee's own perceptions of [her] performance." *Holifield v. Reno*, 115 F.3d 1555, 1565 (11th Cir. 1997) (*citing Billet v. CIGNA Corp.*, 940 F.2d 812, 818-22 (3rd Cir.1991).) *See Sempier v. Johnson & Higgins*, 45 F.3d 724, 731 (3rd Cir.1995); *Gray v. U. of Arkansas at Fayetteville*, 883 F.2d 1394, 1401 (8th Cir.1989); *Weihaupt v. American Medical Ass'n.*, 874 F.2d 419, 428 (7th Cir.1989); *Smith v. Flax*, 618 F.2d 1062, 1067 (4th Cir.1980) (finding that the perception of the decisionmaker, not the employee, is relevant.)

own qualifications vastly outweigh the qualifications of her comparators, such that the disparity "jump[s] off the page and slap[s] [the court] in the face." *E.g.*, *Walker*, 286 F.3d at 1277; *Hall*, 326 F.3d at 1167-68. This court declines the invitation to sit as a super-personnel board, second guessing Honda's decision to choose the most qualified employees for the position of Buyer. *See Chapman*, 229 F.3d at 1030; *Damon*, 196 F.3d at 1361.

While the failure to promote issue is undisputedly a component of Thornton's retaliation claim, Thornton has not stated a claim for disparate treatment failure to promote under Title VII in her amended complaint. Further, Defendant Honda, although addressing failure to promote in the context of the retaliation claim, does not engage in analysis on the disparate treatment issue. Thus, while Thornton's opposition to the motions for summary judgment may suggest a separate failure to promote claim, this court does not consider it as such. However, even if Thornton had made a claim for disparate treatment for failure to promote, that claim would not survive a motion for summary judgment for many of the same reasons that her retaliation claim fails.

A prima facie case of failure to promote by the use of circumstantial evidence is established where the plaintiff shows: (1) that she belongs to a protected class; (2) that she applied for and was qualified for the position for which the employer was seeking applicants; (3) that she was denied the promotion; and (4) that another equally or less qualified individual outside of the protected class received the promotion or that the position remained open. *See Batey v. Stone*, 24 F.3d 1330, 1334 n. 11 (11th Cir. 1994.) After the plaintiff has produced evidence sufficient to establish her prima facie case, the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for the failure to promote. Upon articulation, the burden shifts again back to the plaintiff to prove that the articulated reason acted as a pretext for discrimination. *See McDonnell Douglas v. Green*, 411

U.S. 792, 802-03 (1973.) And even if there were evidence that Plaintiff and those promoted instead of her were relatively equal in skill and experience, that would still not provide evidence of discrimination. Case law consistently asserts that "if an employer selects the person it believes is best qualified, an argument of pretext ordinarily will fail." *See Smith v. Horner*, 839 F.2d 1530, 1538 (11th Cir. 1988) (citing *Clark v. Huntsville Bd. of Educ.*, 717 F.2d 525, 527 (11th Cir. 1983).) Once the defendant employer has presented a non-discriminatory reason for its failure to promote the plaintiff, the plaintiff has the burden to establish that he was so much more qualified than the person hired that the disparity virtually "jumps off the page and slaps one in the face." *Walker v. Prudential Prop. & Cas. Ins. Co.*, 286 F.3d 1270, 1277 (11th Cir.2002.) The phrase "jumps off the page and slaps you in the face" means that the disparities in qualifications must be of such weight and significance that no reasonable person could have chosen the candidate selected over the plaintiff. *See Hall v. Ala. Ass'n. of Sch. Bds.*, 326 F.3d 1157, 1167-68 (11th Cir. 2003); *Lee v. GTE Florida, Inc.,* 226 F.3d 1249, 1254 (11th Cir.2000.)

This high standard for establishing discrimination based on the relative qualifications of the competitors for a promotion serves the purpose of keeping the federal courts from second-guessing decisions made by employers in the course of their business. As the Eleventh Circuit explained in *Damon v. Fleming Supermarkets of Florida, Inc.,* 196 F.3d 1354, 1361 (11th Cir.1999), federal courts "are not in the business of adjudging whether employment decisions are prudent or fair. Instead our sole concern is whether unlawful discriminatory animus motivates a challenged employment decision." *See Deines v. Texas Dept. of Protective and Regulatory Services*, 164 F.3d 277, 281(5th Cir. 1999) (explaining that "it is not the function of the jury to scrutinize the employer's judgment as to who is best qualified to fill the position.... The single issue for the trier

93

of fact is whether the employer's selection of a particular applicant over the plaintiff was motivated by discrimination").

For this separate reason, Defendant Honda's Motion for Summary Judgment (Doc. #30) as it relates to Thornton's claim of retaliation is due to be granted.

## V.   __Conclusion__

For the reasons stated above, Defendant Tom Chickerella's ("Chickerella") Motion for Summary Judgment (Doc. #50) is due to be **DENIED, IN PART,** as to all claims asserted against him by Plaintiff Vick; **GRANTED, IN PART,** as to Plaintiff Springfield's invasion of privacy claim and **DENIED, IN PART,** as to Plaintiff Thornton's invasion of privacy claim.  Defendant Honda Manufacturing of Alabama's ("Honda") Motion for Summary Judgment (Doc. #30) is due to be **GRANTED** as to all claims asserted against it by Plaintiff Thornton.  Defendant Honda's Motion for Summary Judgment (Doc. #31) is due to be **GRANTED, IN PART,** as to Plaintiff Vick's assault and battery claim and **DENIED, IN PART,** as to Plaintiff Vick's invasion of privacy claim. Defendant Honda's Motion for Summary Judgment (Doc. #32) is due to be **GRANTED** as to all claims asserted against it by Plaintiff Springfield.  Defendant Honda's Motion for Summary Judgment (Doc. #33) is due to be **GRANTED** as to all claims asserted against it by Plaintiff Tiedemann.  Finally, Defendants' Motion to Strike Portions of Affidavit of Teresa Springfield (Doc. #70), Motion to Strike Portions of Affidavit of Tara Vick (Doc. #71), Motion to Strike Plaintiffs' Affidavits (Doc. #79), and Motion to Deem Admitted Certain Facts (Doc. #80) are due to be **GRANTED IN PART** and **DENIED IN PART** to the extent addressed within this memorandum

opinion.

**DONE** and **ORDERED** this _19th_ day of July, 2004.

_____

**R. DAVID PROCTOR**
UNITED STATES DISTRICT JUDGE